# WARD ET AL. *v.* ROCK AGAINST RACISM

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

No. 88–226.   Argued February 27, 1989—Decided June 22, 1989

782

*Leonard J. Koerner* argued the cause for petitioners. With him on the brief were *Peter L. Zimroth, Larry A. Sonnenshein,* and *Julian L. Kalkstein.*

*William M. Kunstler* argued the cause for respondent. With him on the brief was *Noah A. Kinigstein.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Bolton, Deputy*

JUSTICE KENNEDY delivered the opinion of the Court.

In the southeast portion of New York City's Central Park, about 10 blocks upward from the park's beginning point at 59th Street, there is an amphitheater and stage structure known as the Naumberg Acoustic Bandshell. The bandshell faces west across the remaining width of the park. In close proximity to the bandshell, and lying within the directional path of its sound, is a grassy open area called the Sheep Meadow. The city has designated the Sheep Meadow as a quiet area for passive recreations like reclining, walking, and reading. Just beyond the park, and also within the potential sound range of the bandshell, are the apartments and residences of Central Park West.

This case arises from the city's attempt to regulate the volume of amplified music at the bandshell so the performances are satisfactory to the audience without intruding upon those who use the Sheep Meadow or live on Central Park West and in its vicinity.

The city's regulation requires bandshell performers to use sound-amplification equipment and a sound technician provided by the city. The challenge to this volume control technique comes from the sponsor of a rock concert. The trial court sustained the noise control measures, but the Court of Appeals for the Second Circuit reversed. We granted certiorari to resolve the important First Amendment issues presented by the case.

I

Rock Against Racism, respondent in this case, is an unincorporated association which, in its own words, is "dedicated to the espousal and promotion of antiracist views." App. to Pet. for Cert. 3. Each year from 1979 through 1986, RAR has sponsored a program of speeches and rock music at the

Solicitor General Ayer, Stephen L. Nightingale, and John F. Cordes; and for the National League of Cities by Benna Ruth Solomon, Joyce Holmes Benjamin, and Ogden N. Lewis.

bandshell. RAR has furnished the sound equipment and sound technician used by the various performing groups at these annual events.

Over the years, the city received numerous complaints about excessive sound amplification at respondent's concerts from park users and residents of areas adjacent to the park. On some occasions RAR was less than cooperative when city officials asked that the volume be reduced; at one concert, police felt compelled to cut off the power to the sound system, an action that caused the audience to become unruly and hostile. App. 127–131, 140–141, 212–214, 345–347.

Before the 1984 concert, city officials met with RAR representatives to discuss the problem of excessive noise. It was decided that the city would monitor sound levels at the edge of the concert ground, and would revoke respondent's event permit if specific volume limits were exceeded. Sound levels at the concert did exceed acceptable levels for sustained periods of time, despite repeated warnings and requests that the volume be lowered. Two citations for excessive volume were issued to respondent during the concert. When the power was eventually shut off, the audience became abusive and disruptive.

The following year, when respondent sought permission to hold its upcoming concert at the bandshell, the city declined to grant an event permit, citing its problems with noise and crowd control at RAR's previous concerts. The city suggested some other city-owned facilities as alternative sites for the concert. RAR declined the invitation and filed suit in United States District Court against the city, its mayor, and various police and parks department officials, seeking an injunction directing issuance of an event permit. After respondent agreed to abide by all applicable regulations, the parties reached agreement and a permit was issued.

The city then undertook to develop comprehensive New York City Parks Department Use Guidelines for the Naumberg Bandshell. A principal problem to be addressed by

the guidelines was controlling the volume of amplified sound at bandshell events. A major concern was that at some bandshell performances the event sponsors had been unable to "provide the amplification levels required and 'crowds unhappy with the sound became disappointed or unruly.'" Brief for Petitioners 9. The city found that this problem had several causes, including inadequate sound equipment, sound technicians who were either unskilled at mixing sound outdoors or unfamiliar with the acoustics of the bandshell and its surroundings, and the like. Because some performers compensated for poor sound mix by raising volume, these factors tended to exacerbate the problem of excess noise.[1] App. 30, 189, 218–219.

The city considered various solutions to the sound-amplification problem. The idea of a fixed decibel limit for all performers using the bandshell was rejected because the impact on listeners of a single decibel level is not constant, but varies in response to changes in air temperature, foliage, audience size, and like factors. *Id.*, at 31, 220, 285–286. The city also rejected the possibility of employing a sound technician to operate the equipment provided by the various sponsors of bandshell events, because the city's technician might have had difficulty satisfying the needs of sponsors while operating unfamiliar, and perhaps inadequate, sound equipment. *Id.*,

---

[1] The amplified sound heard at a rock concert consists of two components, volume and mix. Sound produced by the various instruments and performers on stage is picked up by microphones and fed into a central mixing board, where it is combined into one signal and then amplified through speakers to the audience. A sound technician is at the mixing board to select the appropriate mix, or balance, of the various sounds produced on stage, and to add other effects as desired by the performers. In addition to controlling the sound mix, the sound technician also controls the overall volume of sound reaching the audience. During the course of a performance, the sound technician is continually manipulating various controls on the mixing board to provide the desired sound mix and volume. The sound technician thus plays an important role in determining the quality of the amplified sound that reaches the audience.

at 220. Instead, the city concluded that the most effective way to achieve adequate but not excessive sound amplification would be for the city to furnish high quality sound equipment and retain an independent, experienced sound technician for all performances at the bandshell. After an extensive search the city hired a private sound company capable of meeting the needs of all the varied users of the bandshell.

The Use Guidelines were promulgated on March 21, 1986.[2] After learning that it would be expected to comply with the guidelines at its upcoming annual concert in May 1986, respondent returned to the District Court and filed a motion for an injunction against the enforcement of certain aspects of the guidelines. The District Court preliminarily enjoined enforcement of the sound-amplification rule on May 1, 1986. See 636 F. Supp. 178 (SDNY 1986). Under the protection of the injunction, and alone among users of the bandshell in the 1986 season, RAR was permitted to use its own sound equip-

---

[2] In pertinent part, the Use Guidelines provide:
"SOUND AMPLIFICATION

"To provide the best sound for all events Department of Parks and Recreation has leased a sound amplification system designed for the specific demands of the Central Park Bandshell. To insure appropriate sound quality balanced with respect for nearby residential neighbors and the mayorally decreed quiet zone of Sheep Meadow, all sponsors may use only the Department of Parks and Recreation sound system. DEPARTMENT OF PARKS AND RECREATION IS TO BE THE SOLE AND ONLY PROVIDER OF SOUND AMPLIFICATION, INCLUDING THOUGH NOT LIMITED TO AMPLIFIERS, SPEAKERS, MONITORS, MICROPHONES, AND PROCESSORS.

"Clarity of sound results from a combination of amplification equipment and a sound technician's familiarity and proficiency with that system. Department of Parks and Recreation will employ a professional sound technician [who] will be fully versed in sound bounce patterns, daily air currents, and sound skipping within the Park. The sound technician must also consider the Bandshell's proximity to Sheep Meadow, activities at Bethesda Terrace, and the New York City Department of Environmental Protection recommendations." App. 375–376.

ment and technician, just as it had done in prior years. RAR's 1986 concert again generated complaints about excessive noise from park users and nearby residents. App. 127, 138.

After the concert, respondent amended its complaint to seek damages and a declaratory judgment striking down the guidelines as facially invalid. After hearing five days of testimony about various aspects of the guidelines, the District Court issued its decision upholding the sound-amplification guideline.[3] The court found that the city had been "motivated by a desire to obtain top-flight sound equipment and experienced operators" in selecting an independent contractor to provide the equipment and technician for bandshell events, and that the performers who did use the city's sound system in the 1986 season, in performances "which ran the full cultural gamut from grand opera to salsa to reggae," were uniformly pleased with the quality of the sound provided. 658 F. Supp. 1346, 1352 (SDNY 1987).

Although the city's sound technician controlled both sound volume and sound mix by virtue of his position at the mixing board, the court found that "[t]he City's practice for events at the Bandshell is to give the sponsor autonomy with respect to the sound mix: balancing treble with bass, highlighting a particular instrument or voice, and the like," and that the city's sound technician "does all he can to accommodate the sponsor's desires in those regards." *Ibid.* Even with respect to volume control, the city's practice was to confer with the sponsor before making any decision to turn the volume down. *Ibid.* In some instances, as with a New York Grand Opera performance, the sound technician accommodated the performers' unique needs by integrating special microphones with the city's equipment. The court specifically found that "[t]he City's implementation of the Bandshell guidelines provides for a sound amplification system capable of meeting

---

[3] The court invalidated certain other aspects of the Use Guidelines, but those provisions are not before us.

RAR's technical needs and leaves control of the sound 'mix' in the hands of RAR." *Id.*, at 1353. Applying this Court's three-part test for judging the constitutionality of government regulation of the time, place, or manner of protected speech, the court found the city's regulation valid.

The Court of Appeals reversed. 848 F. 2d 367 (CA2 1988). After recognizing that "[c]ontent neutral time, place and manner regulations are permissible so long as they are narrowly tailored to serve a substantial government interest and do not unreasonably limit alternative avenues of expression," the court added the proviso that "the method and extent of such regulation must be reasonable, that is, it must be the least intrusive upon the freedom of expression as is reasonably necessary to achieve a legitimate purpose of the regulation." *Id.*, at 370 (citing *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968)). Applying this test, the court determined that the city's guideline was valid only to the extent necessary to achieve the city's legitimate interest in controlling excessive volume, but found there were various alternative means of controlling volume without also intruding on respondent's ability to control the sound mix. For example, the city could have directed respondent's sound technician to keep the volume below specified levels. Alternatively, a volume-limiting device could have been installed; and as a "last resort," the court suggested, "the plug can be pulled on the sound to enforce the volume limit." 848 F. 2d, at 372, n. 6. In view of the potential availability of these seemingly less restrictive alternatives, the Court of Appeals concluded that the sound-amplification guideline was invalid because the city had failed to prove that its regulation "was the least intrusive means of regulating the volume." *Id.*, at 371.

We granted certiorari, 488 U. S. 816 (1988), to clarify the legal standard applicable to governmental regulation of the time, place, or manner of protected speech. Because the Court of Appeals erred in requiring the city to prove that its regulation was the least intrusive means of furthering its le-

gitimate governmental interests, and because the ordinance is valid on its face, we now reverse.

## II

Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. See 2 Dialogues of Plato, Republic, bk. 3, pp. 231, 245–248 (B. Jowett transl., 4th ed. 1953) ("Our poets must sing in another and a nobler strain"); Musical Freedom and Why Dictators Fear It, N. Y. Times, Aug. 23, 1981, section 2, p. 1, col. 5; Soviet Schizophrenia toward Stravinsky, N. Y. Times, June 26, 1982, section 1, p. 25, col. 2; Symphonic Voice from China Is Heard Again, N. Y. Times, Oct. 11, 1987, section 2, p. 27, col. 1. The Constitution prohibits any like attempts in our own legal order. Music, as a form of expression and communication, is protected under the First Amendment. In the case before us the performances apparently consisted of remarks by speakers, as well as rock music, but the case has been presented as one in which the constitutional challenge is to the city's regulation of the musical aspects of the concert; and, based on the principle we have stated, the city's guideline must meet the demands of the First Amendment. The parties do not appear to dispute that proposition.

We need not here discuss whether a municipality which owns a bandstand or stage facility may exercise, in some circumstances, a proprietary right to select performances and control their quality. See *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 570–574 (1975) (REHNQUIST, J., dissenting). Though it did demonstrate its own interest in the effort to insure high quality performances by providing the equipment in question, the city justifies its guideline as a regulatory measure to limit and control noise. Here the bandshell was open, apparently, to all performers; and we de-

cide the case as one in which the bandshell is a public forum for performances in which the government's right to regulate expression is subject to the protections of the First Amendment. *United States* v. *Grace*, 461 U. S. 171, 177 (1983); see *Frisby* v. *Schultz*, 487 U. S. 474, 481 (1988); *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983). Our cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984); see *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 648 (1981) (quoting *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976)). We consider these requirements in turn.

## A

The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Community for Creative Non-Violence, supra*, at 295. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. See *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 47–48 (1986). Government regulation of expressive activity is content neutral so long as it is "*justified* without reference to the content of the regulated speech." *Community for Creative Non-Violence, supra*, at 293 (emphasis added); *Heffron, supra*, at 648 (quoting *Virginia Pharmacy Bd., supra*, at

771); see *Boos* v. *Barry*, 485 U. S. 312, 320–321 (1988) (opinion of O'CONNOR, J.).

The principal justification for the sound-amplification guideline is the city's desire to control noise levels at bandshell events, in order to retain the character of the Sheep Meadow and its more sedate activities, and to avoid undue intrusion into residential areas and other areas of the park. This justification for the guideline "ha[s] nothing to do with content," *Boos* v. *Barry*, *supra*, at 320, and it satisfies the requirement that time, place, or manner regulations be content neutral.

The only other justification offered below was the city's interest in "ensur[ing] the quality of sound at Bandshell events." 658 F. Supp., at 1352; see 848 F. 2d, at 370, n. 3. Respondent urges that this justification is not content neutral because it is based upon the quality, and thus the content, of the speech being regulated. In respondent's view, the city is seeking to assert artistic control over performers at the bandshell by enforcing a bureaucratically determined, value-laden conception of good sound. That all performers who have used the city's sound equipment have been completely satisfied is of no moment, respondent argues, because "[t]he First Amendment does not permit and cannot tolerate state control of artistic expression merely because the State claims that [its] efforts will lead to 'top-quality' results." Brief for Respondent 19.

While respondent's arguments that the government may not interfere with artistic judgment may have much force in other contexts, they are inapplicable to the facts of this case. The city has disclaimed in express terms any interest in imposing its own view of appropriate sound mix on performers. To the contrary, as the District Court found, the city requires its sound technician to defer to the wishes of event sponsors concerning sound mix. 658 F. Supp., at 1352–1353. On this record, the city's concern with sound quality extends only to the clearly content-neutral goals of ensuring adequate

sound amplification and avoiding the volume problems associated with inadequate sound mix.[1]   Any governmental attempt to serve purely esthetic goals by imposing subjective standards of acceptable sound mix on performers would raise serious First Amendment concerns, but this case provides us with no opportunity to address those questions.   As related above, the District Court found that the city's equipment and its sound technician could meet all of the standards requested by the performers, including RAR.

Respondent argues further that the guideline, even if not content based in explicit terms, is nonetheless invalid on its face because it places unbridled discretion in the hands of city officials charged with enforcing it.   See Lakewood v. Plain Dealer Publishing Co., 486 U. S. 750, 769–772 (1988) (4-to-3 decision); Heffron v. International Society for Krishna Consciousness, Inc., supra, at 649; Freedman v. Maryland, 380 U. S. 51, 56 (1965); Thornhill v. Alabama, 310 U. S. 88, 97 (1940).   According to respondent, there is nothing in the language of the guideline to prevent city officials from selecting wholly inadequate sound equipment or technicians, or even from varying the volume and quality of sound based on the message being conveyed by the performers.

As a threshold matter, it is far from clear that respondent should be permitted to bring a facial challenge to this aspect of the regulation.   Our cases permitting facial challenges to regulations that allegedly grant officials unconstrained authority to regulate speech have generally involved licensing schemes that "ves[t] unbridled discretion in a government official over whether to permit or deny expressive activity." Plain Dealer, supra, at 755.   The grant of discretion that re-

---

[1] As noted above, there is evidence to suggest that volume control and sound mix are interrelated to a degree, in that performers unfamiliar with the acoustics of the bandshell sometimes attempt to compensate for poor sound mix by increasing volume.   App. 218, 290–291.   By providing adequate sound equipment and professional sound mixing, the city avoids this problem.

spondent seeks to challenge here is of an entirely different, and lesser, order of magnitude, because respondent does not suggest that city officials enjoy unfettered discretion to deny bandshell permits altogether. Rather, respondent contends only that the city, by exercising what is concededly its right to regulate amplified sound, could choose to provide inadequate sound for performers based on the content of their speech. Since respondent does not claim that city officials enjoy unguided discretion to deny the right to speak altogether, it is open to question whether respondent's claim falls within the narrow class of permissible facial challenges to allegedly unconstrained grants of regulatory authority. Cf. 486 U. S., at 787 (WHITE, J., dissenting) (arguing that facial challenges of this type are permissible only where "the local law at issue require[s] licenses—not for a narrow category of expressive conduct that could be prohibited—but for a sweeping range of First Amendment protected activity").

We need not decide, however, whether the "extraordinary doctrine" that permits facial challenges to some regulations of expression, see id., at 772 (WHITE, J., dissenting), should be extended to the circumstances of this case, for respondent's facial challenge fails on its merits. The city's guideline states that its goals are to "provide the best sound for all events" and to "insure appropriate sound quality balanced with respect for nearby residential neighbors and the mayorally decreed quiet zone of [the] Sheep Meadow." App. 375. While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity. See Grayned v. City of Rockford, 408 U. S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty in our language"); see also Kovacs v. Cooper, 336 U. S. 77, 79 (1949) (rejecting vagueness challenge to city ordinance forbidding "loud and raucous" sound amplification) (opinion of Reed, J.). By its own terms the

city's sound-amplification guideline must be interpreted to forbid city officials purposely to select inadequate sound systems or to vary the sound quality or volume based on the message being delivered by performers. The guideline is not vulnerable to respondent's facial challenge.[5]

Even if the language of the guideline were not sufficient on its face to withstand challenge, our ultimate conclusion would be the same, for the city has interpreted the guideline in such a manner as to provide additional guidance to the officials charged with its enforcement. The District Court expressly found that the city's policy is to defer to the sponsor's desires concerning sound quality. 658 F. Supp., at 1352. With respect to sound volume, the city retains ultimate control, but city officials "mak[e] it a practice to confer with the sponsor if any questions of excessive sound arise, before taking any corrective action." *Ibid.* The city's goal of ensuring that "the sound amplification [is] sufficient to reach all listeners within the defined concertground," *ibid.*, serves to limit further the discretion of the officials on the scene. Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for "[i]n evaluating a facial

---

[5] The dissent's suggestion that the guideline constitutes a prior restraint is not consistent with our cases. See *post*, at 808–809. As we said in *Southeastern Promotions, Ltd. v. Conrad*, 420 U. S. 546 (1975), the regulations we have found invalid as prior restraints have "had this in common: they gave public officials the power to deny use of a forum in advance of actual expression." *Id.*, at 553. The sound-amplification guideline, by contrast, grants no authority to forbid speech, but merely permits the city to regulate volume to the extent necessary to avoid excessive noise. It is true that the city's sound technician theoretically possesses the power to shut off the volume for any particular performer, but that hardly distinguishes this regulatory scheme from any other; government will *always* possess the raw power to suppress speech through force, and indeed it was in part to avoid the necessity of exercising its power to "pull the plug" on the volume that the city adopted the sound-amplification guideline. The relevant question is whether the challenged regulation *authorizes* suppression of speech in advance of its expression, and the sound-amplification guideline does not.

challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered." *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 494, n. 5 (1982); see *Plain Dealer*, 486 U. S., at 769–770, and n. 11; *United States* v. *Grace*, 461 U. S., at 181, n. 10; *Grayned* v. *City of Rockford, supra*, at 110; *Poulos* v. *New Hampshire*, 345 U. S. 395 (1953). Any inadequacy on the face of the guideline would have been more than remedied by the city's narrowing construction.

## B

The city's regulation is also "narrowly tailored to serve a significant governmental interest." *Community for Creative Non-Violence*, 468 U. S., at 293. Despite respondent's protestations to the contrary, it can no longer be doubted that government "ha[s] a substantial interest in protecting its citizens from unwelcome noise." *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 806 (1984) (citing *Kovacs* v. *Cooper, supra*); see *Grayned, supra*, at 116. This interest is perhaps at its greatest when government seeks to protect " 'the well-being, tranquility, and privacy of the home,' " *Frisby* v. *Schultz*, 487 U. S., at 484 (quoting *Carey* v. *Brown*, 447 U. S. 455, 471 (1980)), but it is by no means limited to that context, for the government may act to protect even such traditional public forums as city streets and parks from excessive noise. *Kovacs* v. *Cooper*, 336 U. S., at 86–87 (opinion of Reed, J.); *id.*, at 96–97 (Frankfurter, J., concurring); *id.*, at 97 (Jackson, J., concurring); see *Community for Creative Non-Violence, supra*, at 296 (recognizing the government's "substantial interest in maintaining the parks . . . in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them").

We think it also apparent that the city's interest in ensuring the sufficiency of sound amplification at bandshell events is a substantial one. The record indicates that inadequate

sound amplification has had an adverse affect on the ability of some audiences to hear and enjoy performances at the bandshell. The city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer, from amplified music to silent meditation. See *Community for Creative Non-Violence, supra,* at 296.

The Court of Appeals recognized the city's substantial interest in limiting the sound emanating from the bandshell. See 848 F. 2d, at 370. The court concluded, however, that the city's sound-amplification guideline was not narrowly tailored to further this interest, because "it has not [been] shown . . . that the requirement of the use of the city's sound system and technician was the *least intrusive means* of regulating the volume." *Id.,* at 371 (emphasis added). In the court's judgment, there were several alternative methods of achieving the desired end that would have been less restrictive of respondent's First Amendment rights.

The Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was "the least intrusive means" of achieving the desired end. This "less-restrictive-alternative analysis . . . has never been a part of the inquiry into the validity of a time, place, and manner regulation." *Regan* v. *Time, Inc.,* 468 U. S. 641, 657 (1984) (opinion of WHITE, J.). Instead, our cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid "simply because there is some imaginable alternative that might be less burdensome on speech." *United States* v. *Albertini,* 472 U. S. 675, 689 (1985).

The Court of Appeals apparently drew its least-intrusive-means requirement from *United States* v. *O'Brien,* 391 U. S., at 377, the case in which we established the standard for judging the validity of restrictions on expressive conduct. See 848 F. 2d, at 370. The court's reliance was misplaced,

however, for we have held that the *O'Brien* test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions." *Community for Creative Non-Violence, supra,* at 298. Indeed, in *Community for Creative Non-Violence,* we squarely rejected reasoning identical to that of the court below:

> "We are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the Government interest in preserving park lands. . . . We do not believe . . . that either *United States* v. *O'Brien* or the time, place, or manner decisions assign to the judiciary the authority to replace the [parks department] as the manager of the [city's] parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained." 468 U. S., at 299.

Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.[6]

[6] Respondent contends that our decision last Term in *Boos* v. *Barry,* 485 U. S. 312 (1988), supports the conclusion that "a regulation is neither precisely drawn nor 'narrowly tailored' if less intrusive means than those employed are available." Brief for Respondent 27. In *Boos* we concluded that the government regulation at issue was "not narrowly tailored; a less restrictive alternative is readily available." 485 U. S., at 329 (citing *Wygant* v. *Jackson Bd. of Ed.,* 476 U. S. 267, 280, n. 6 (1986) (plurality opinion)). In placing reliance on *Boos,* however, respondent ignores a crucial difference between that case and this. The regulation we invalidated in *Boos* was a content-based ban on displaying signs critical of foreign governments; such content-based restrictions on political speech "must be subjected to the most exacting scrutiny." 485 U. S., at 321. While time, place, or manner regulations must also be "narrowly tailored" in order to survive First Amendment challenge, we have never applied strict scrutiny

Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States* v. *Albertini, supra,* at 689; see also *Community for Creative Non-Violence, supra,* at 297. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.[7] See *Frisby*

in this context. As a result, the same degree of tailoring is not required of these regulations, and least-restrictive-alternative analysis is wholly out of place. For the same reason, the dissent's citation of *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469 (1989), is beside the point. See *post,* at 806, n. 4. *Croson,* like *Boos,* is a strict-scrutiny case; even the dissent does not argue that strict scrutiny is applicable to time, place, or manner regulations.

Our summary affirmance of *Watseka* v. *Illinois Public Action Council,* 796 F. 2d 1547 (CA7 1986), aff'd, 479 U. S. 1048 (1987), is not to the contrary. Although the Seventh Circuit in that case did adopt the least-restrictive-alternative approach, see 796 F. 2d, at 1553–1554, its judgment was also supported by the alternative grounds that the regulation at issue did not serve to further the stated governmental interests and did not leave open alternative channels of communication. *Id.,* at 1555–1558. As we have noted on more than one occasion: "A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." *Anderson* v. *Celebrezze,* 460 U. S. 780, 785, n. 5 (1983).

[7] The dissent's attempt to analogize the sound-amplification guideline to a total ban on distribution of handbills is imaginative but misguided. See *post,* at 806–807. The guideline does not ban all concerts, or even all rock concerts, but instead focuses on the source of the evils the city seeks to eliminate—excessive and inadequate sound amplification—and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils. This is the essence of narrow tailoring. A ban on handbilling, of course, would suppress a great quantity of speech that does not cause the evils that it seeks to eliminate, whether they be fraud, crime, litter, traffic congestion, or noise. See *Martin* v. *Struthers,* 319 U. S. 141, 145–146 (1943). For that

v. *Schultz*, 487 U. S., at 485 ("A complete ban can be nar-
rowly tailored but only if each activity within the proscrip-
tion's scope is an appropriately targeted evil").   So long as
the means chosen are not substantially broader than neces-
sary to achieve the government's interest, however, the
regulation will not be invalid simply because a court con-
cludes that the government's interest could be adequately
served by some less-speech-restrictive alternative.   "The
validity of [time, place, or manner] regulations does not turn
on a judge's agreement with the responsible decisionmaker
concerning the most appropriate method for promoting sig-
nificant government interests" or the degree to which those
interests should be promoted.   *United States* v. *Albertini*,
472 U. S., at 689; see *Community for Creative Non-Violence*,
*supra*, at 299.

It is undeniable that the city's substantial interest in limit-
ing sound volume is served in a direct and effective way by
the requirement that the city's sound technician control the
mixing board during performances.   Absent this require-
ment, the city's interest would have been served less well, as
is evidenced by the complaints about excessive volume gener-
ated by respondent's past concerts.   The alternative regula-
tory methods hypothesized by the Court of Appeals reflect
nothing more than a disagreement with the city over how
much control of volume is appropriate or how that level
of control is to be achieved.   See *Community for Creative
Non-Violence*, *supra*, at 299.   The Court of Appeals erred in
failing to defer to the city's reasonable determination that
its interest in controlling volume would be best served by
requiring bandshell performers to utilize the city's sound
technician.

The city's second content-neutral justification for the
guideline, that of ensuring "that the sound amplification [is]
sufficient to reach all listeners within the defined concert-

reason, a complete ban on handbilling would be substantially broader than
necessary to achieve the interests justifying it.

ground," 658 F. Supp., at 1352, also supports the city's choice of regulatory methods. By providing competent sound technicians and adequate amplification equipment, the city eliminated the problems of inexperienced technicians and insufficient sound volume that had plagued some bandshell performers in the past. No doubt this concern is not applicable to respondent's concerts, which apparently were characterized by more-than-adequate sound amplification. But that fact is beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case. Here, the regulation's effectiveness must be judged by considering all the varied groups that use the bandshell, and it is valid so long as the city could reasonably have determined that its interests overall would be served less effectively without the sound-amplification guideline than with it. *United States* v. *Albertini, supra,* at 688–689; *Community for Creative Non-Violence,* 468 U. S., at 296–297. Considering these proffered justifications together, therefore, it is apparent that the guideline directly furthers the city's legitimate governmental interests and that those interests would have been less well served in the absence of the sound-amplification guideline.

Respondent nonetheless argues that the sound-amplification guideline is not narrowly tailored because, by placing control of sound mix in the hands of the city's technician, the guideline sweeps far more broadly than is necessary to further the city's legitimate concern with sound volume. According to respondent, the guideline "targets . . . more than the exact source of the 'evil' it seeks to remedy." *Frisby* v. *Schultz, supra,* at 485.

If the city's regulatory scheme had a substantial deleterious effect on the ability of bandshell performers to achieve the quality of sound they desired, respondent's concerns would have considerable force. The District Court found,

however, that pursuant to city policy, the city's sound technician "give[s] the sponsor autonomy with respect to the sound mix . . . [and] does all that he can to accommodate the sponsor's desires in those regards." 658 F. Supp., at 1352. The court squarely rejected respondent's claim that the city's "technician is not able properly to implement a sponsor's instructions as to sound quality or mix," finding that "[n]o evidence to that effect was offered at trial; as noted, the evidence is to the contrary." App. to Pet. for Cert. 89. In view of these findings, which were not disturbed by the Court of Appeals, we must conclude that the city's guideline has no material impact on any performer's ability to exercise complete artistic control over sound quality. Since the guideline allows the city to control volume without interfering with the performer's desired sound mix, it is not "substantially broader than necessary" to achieve the city's legitimate ends, *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S., at 808, and thus it satisfies the requirement of narrow tailoring.

## C

The final requirement, that the guideline leave open ample alternative channels of communication, is easily met. Indeed, in this respect the guideline is far less restrictive than regulations we have upheld in other cases, for it does not attempt to ban any particular manner or type of expression at a given place or time. Cf. *Frisby, supra,* at 482–484; *Community for Creative Non-Violence, supra,* at 295; *Renton* v. *Playtime Theatres, Inc.,* 475 U. S., at 53–54. Rather, the guideline continues to permit expressive activity in the bandshell, and has no effect on the quantity or content of that expression beyond regulating the extent of amplification. That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate. See *Taxpay-*

ers *for Vincent, supra,* at 803, and n. 23, 812, and n. 30; *Kovacs,* 336 U. S., at 88–89 (opinion of Reed, J.).

## III

The city's sound-amplification guideline is narrowly tailored to serve the substantial and content-neutral governmental interests of avoiding excessive sound volume and providing sufficient amplification within the bandshell concert ground, and the guideline leaves open ample channels of communication. Accordingly, it is valid under the First Amendment as a reasonable regulation of the place and manner of expression. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN concurs in the result.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

No one can doubt that government has a substantial interest in regulating the barrage of excessive sound that can plague urban life. Unfortunately, the majority plays to our shared impatience with loud noise to obscure the damage that it does to our First Amendment rights. Until today, a key safeguard of free speech has been government's obligation to adopt the least intrusive restriction necessary to achieve its goals. By abandoning the requirement that time, place, and manner regulations must be narrowly tailored, the majority replaces constitutional scrutiny with mandatory deference. The majority's willingness to give government officials a free hand in achieving their policy ends extends so far as to permit, in this case, government control of speech in advance of its dissemination. Because New York City's Use Guidelines (Guidelines) are not narrowly tailored to serve its interest in regulating loud noise, and because they constitute an impermissible prior restraint, I dissent.

## I

The majority sets forth the appropriate standard for assessing the constitutionality of the Guidelines. A time, place, and manner regulation of expression must be content neutral, serve a significant government interest, be narrowly tailored to serve that interest, and leave open ample alternative channels of communication. See *Frisby* v. *Schultz*, 487 U. S. 474, 481–482 (1988); *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 44 (1983). The Guidelines indisputably are content neutral as they apply to all bandshell users irrespective of the message of their music. App. 375; see *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of Cal.*, 475 U. S. 1, 20 (1985).[1] They also serve government's significant interest in limiting loud noise in public places, see *Grayned* v. *Rockford*, 408 U. S. 104, 116 (1972), by giving the city exclusive control of all sound equipment.

My complaint is with the majority's serious distortion of the narrow tailoring requirement. Our cases have not, as the majority asserts, "clearly" rejected a less-restrictive-alternative test. *Ante*, at 797. On the contrary, just last Term, we held that a statute is narrowly tailored only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby* v. *Schultz, supra*, at 485. While there is language in a few opinions which, taken out of

---

[1] The majority's reliance on *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986), is unnecessary and unwise. That decision dealt only with the unique circumstances of "businesses that purvey sexually explicit materials," *Id.*, at 49, and n. 2. Today, for the first time, a majority of the Court applies *Renton* analysis to a category of speech far afield from that decision's original limited focus. Given the serious threat to free expression posed by *Renton* analysis, see *Boos* v. *Barry*, 485 U. S. 312, 335–337 (1988) (BRENNAN, J., concurring in part and concurring in judgment); *Renton, supra*, at 55 (BRENNAN, J., concurring in part and concurring in judgment), I fear that its broad application may encourage widespread official censorship.

context, supports the majority's position,[2] in practice, the Court has interpreted the narrow tailoring requirement to mandate an examination of alternative methods of serving the asserted governmental interest and a determination whether the greater efficacy of the challenged regulation outweighs the increased burden it places on protected speech. See, *e. g.*, *Martin* v. *Struthers*, 319 U. S. 141, 147–148 (1943); *Schneider* v. *State*, 308 U. S. 147, 162 (1939). In *Schneider*, for example, the Court invalidated a ban on handbill distribution on public streets, notwithstanding that it was the most effective means of serving government's legitimate interest in minimizing litter, noise, and traffic congestion, and in preventing fraud. The Court concluded that punishing those who actually litter or perpetrate frauds was a much less intrusive, albeit not quite as effective, means to serve those significant interests. *Id.*, at 162, 164; see also *Martin*, *supra*, at 148 (invalidating ban on door-to-door distribution of handbills because directly punishing fraudulent solicitation was a less intrusive, yet still effective, means of serving government's interest in preventing fraud).[3]

---

[2] *United States* v. *Albertini*, 472 U. S. 675 (1985), for example, involved a person's right to enter a military base, which, unlike a public park, is not a place traditionally dedicated to free expression. *Id.*, at 687 (commanding officer's power to exclude civilians from a military base cannot "be analyzed in the same manner as government regulation of a traditional public forum"). Nor can isolated language from JUSTICE WHITE's opinion in *Regan* v. *Time, Inc.*, 468 U. S. 641, 657 (1984), which commanded the votes of only three other Justices, be construed as this Court's definitive explication of the narrow tailoring requirement.

[3] The majority relies heavily on *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984), but in that case, the Court engaged in an inquiry similar to the one the majority now rejects; it considered whether the increased efficacy of the challenged regulation warranted the increased burden on speech. *Id.*, at 299 ("[P]reventing overnight sleeping will avoid a measure of actual or threatened damage"; however, "minimiz[ing] the possible injury by reducing the size, duration, or frequency of demonstrations would still curtail the total allowable expression in which demonstrators could engage").

The Court's past concern for the extent to which a regulation burdens speech more than would a satisfactory alternative is noticeably absent from today's decision. The majority requires only that government show that its interest cannot be served as effectively without the challenged restriction. *Ante*, at 799. It will be enough, therefore, that the challenged regulation advances the government's interest only in the slightest, for any differential burden on speech that results does not enter the calculus. Despite its protestations to the contrary, the majority thus has abandoned the requirement that restrictions on speech be narrowly tailored in any ordinary use of the phrase.[1] Indeed, after today's decision, a city could claim that bans on handbill distribution or on door-to-door solicitation are the most effective means of avoiding littering and fraud, or that a ban on loudspeakers and radios in a public park is the most effective means of avoiding loud noise. Logically extended, the majority's analysis would permit such far-reaching restrictions on speech.

True, the majority states that "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ibid.* But this means that only those regulations that "engage in the gratuitous inhibition of expression" will be invalidated. Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv. L. Rev. 1482, 1485 (1975). Moreover, the majority has robbed courts of the necessary analytic tools to make even this limited inquiry. The Court of Appeals examined "how much control of volume is appropriate [and] how that level of control is to be achieved," *ante*, at 800, but the majority admonishes that court for doing so, stating that it should

---

[1] In marked contrast, Members of the majority recently adopted a far more stringent narrow tailoring requirement in the affirmative-action context. See *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 507–508 (1989).

have "defer[red] to the city's reasonable determination." *Ibid.* The majority thus instructs courts to refrain from examining how much speech may be restricted to serve an asserted interest and how that level of restriction is to be achieved. If a court cannot engage in such inquiries, I am at a loss to understand how a court can ascertain whether the government has adopted a regulation that burdens substantially more speech than is necessary.

Had the majority not abandoned the narrow tailoring requirement, the Guidelines could not possibly survive constitutional scrutiny. Government's interest in avoiding loud sounds cannot justify giving government total control over sound equipment, any more than its interest in avoiding litter could justify a ban on handbill distribution. In both cases, government's legitimate goals can be effectively and less intrusively served by directly punishing the evil—the persons responsible for excessive sounds and the persons who litter. Indeed, the city concedes that it has an ordinance generally limiting noise but has chosen not to enforce it. See Tr. of Oral. Arg. 5–6.[5]

By holding that the Guidelines are valid time, place, and manner restrictions, notwithstanding the availability of less intrusive but effective means of controlling volume, the majority deprives the narrow tailoring requirement of all meaning.[6] Today, the majority enshrines efficacy but sacrifices free speech.

---

[5] Significantly, the National Park Service relies on the very methods of volume control rejected by the city—monitoring sound levels on the perimeter of an event, communicating with event sponsors, and, if necessary, turning off the power. Brief for United States as *Amicus Curiae* 21. In light of the Park Service's "experienc[e] with thousands of events over the years," *ibid.*, the city's claims that these methods of monitoring excessive sound are ineffective and impracticable are hard to accept.

[6] Because I conclude that the Guidelines are not narrowly tailored, there is no need to consider whether there are ample alternative channels for communication. I note only that the availability of alternative channels of communication outside a public park does not magically validate a

## II

The majority's conclusion that the city's exclusive control of sound equipment is constitutional is deeply troubling for another reason. It places the Court's *imprimatur* on a quintessential prior restraint, incompatible with fundamental First Amendment values. See *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931). Indeed, just as "[m]usic is one of the oldest forms of human expression," *ante*, at 790, the city's regulation is one of the oldest forms of speech repression. In 16th- and 17th-century England, government controlled speech through its monopoly on printing presses. See L. Levy, Emergence of a Free Press 6 (1985). Here, the city controls the volume and mix of sound through its monopoly on sound equipment. In both situations, government's exclusive control of the means of communication enables public officials to censor speech in advance of its expression. See *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 553 (1975). Under more familiar prior restraints, government officials censor speech "by a simple stroke of the pen," Emerson, The Doctrine of Prior Restraint, 20 Law & Contemp. Prob. 648, 657 (1955). Here, it is done by a single turn of a knob.

The majority's implication that government control of sound equipment is not a prior restraint because city officials do not "enjoy unguided discretion to deny the right to speak altogether," *ante*, at 794, is startling. In the majority's view, this case involves a question of "different and lesser" magnitude—the discretion to provide inadequate sound for performers. But whether the city denies a performer a bandshell permit or grants the permit and then silences or

government restriction on protected speech within it. See *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 556 (1975) ("'[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place,'" quoting *Schneider* v. *State*, 308 U. S. 147, 163 (1939)).

distorts the performer's music, the result is the same—the city censors speech. In the words of CHIEF JUSTICE REHNQUIST, the First Amendment means little if it permits government to "allo[w] a speaker in a public hall to express his views while denying him the use of an amplifying system." *FEC* v. *National Conservative Political Action Committee,* 470 U. S. 480, 493 (1985); see also *Southeastern Promotions, supra,* at 556, n. 8 ("A licensing system need not effect total suppression in order to create a prior restraint").

As a system of prior restraint, the Guidelines are presumptively invalid. See *Southeastern Promotions, supra,* at 558; *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963). They may be constitutional only if accompanied by the procedural safeguards necessary "to obviate the dangers of a censorship system." *Freedman* v. *Maryland,* 380 U. S. 51, 58 (1965). The city must establish neutral criteria embodied in "narrowly drawn, reasonable and definite standards," in order to ensure that discretion is not exercised based on the content of speech. *Niemotko* v. *Maryland,* 340 U. S. 268, 271 (1951); see also *Lakewood* v. *Plain Dealer Publishing Co.,* 486 U. S., 750, 758 (1988); *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–151 (1969). Moreover, there must be "an almost immediate judicial determination" that the restricted material was unprotected by the First Amendment. *Bantam Books, supra,* at 70; see also *Southeastern Promotions, supra,* at 560.

The Guidelines contain neither of these procedural safeguards. First, there are no "narrowly drawn, reasonable and definite standards" guiding the hands of the city's sound technician as he mixes the sound. The Guidelines state that the goals are "to provide the best sound for all events" and to "insure appropriate sound quality balanced with respect for nearby residential neighbors and the mayorally decreed quiet zone." App. 375; see also *ante,* at 794. But the city never defines "best sound" or "appropriate sound quality." The bandshell program director-manager testified that quality of

sound refers to tone and to sound mix.  App. 229, 230.  Yet questions of tone and mix cannot be separated from musical expression as a whole.  See The New Grove Dictionary of Music and Musicians 51–55 (S. Sadie ed. 1980) (tonality involves relationship between pitches and harmony); F. Everest, Successful Sound System Operation 173 (1985) ("The mixing console . . . must be considered as a creative tool"). Because judgments that sounds are too loud, noiselike, or discordant can mask disapproval of the music itself,[7] government control of the sound-mixing equipment necessitates detailed and neutral standards.

The majority concedes that the standards in the Guidelines are "undoubtedly flexible" and that "the officials implementing them will exercise considerable discretion."  *Ante*, at 794.  Nevertheless, it concludes that "[b]y its own terms the city's sound-amplification guideline must be interpreted to forbid city officials purposefully to select inadequate sound systems or to vary the sound quality or volume based on the message being delivered by performers."  *Ante*, at 794–795. Although the majority wishes it were so, the language of the Guidelines simply does not support such a limitation on the city's discretion.  Alternatively, the majority finds a limitation in the city's practice of deferring to the sponsor with respect to sound mix, and of conferring "with the sponsor if any questions of excessive sound arise, before taking any corrective action."  658 F. Supp. 1346, 1352 (SDNY 1987).  A promise to consult, however, does not provide the detailed

---

[7] "New music always sounds loud to old ears.  Beethoven seemed to make more noise than Mozart; Liszt was noisier than Beethoven; Schoenberg and Stravinsky, noisier than any of their predecessors."  N. Slonimsky, Lexicon of Musical Invective: Critical Assaults on Composers Since Beethoven's Time 18 (1953).  One music critic wrote of Prokofiev: "Those who do not believe that genius is evident in superabundance of noise, looked in vain for a new musical message in Mr. Prokofiev's work.  Nor in the *Classical Symphony*, which the composer conducted, was there any cessation from the orgy of discordant sounds."  *Id.*, at 5 (internal quotations omitted).

"neutral criteria" necessary to prevent future abuses of discretion any more than did the city's promise in *Lakewood* to deny permit applications only for reasons related to the health, safety, or welfare of Lakewood citizens. Indeed, a presumption that city officials will act in good faith and adhere to standards absent from a regulation's face is "the very presumption that the doctrine forbidding unbridled discretion disallows." *Lakewood, supra,* at 770.[8]

Second, even if there were narrowly drawn guidelines limiting the city's discretion, the Guidelines would be fundamentally flawed. For the requirement that there be detailed standards is of value only so far as there is a judicial mechanism to enforce them. Here, that necessary safeguard is absent. The city's sound technician consults with the performers for several minutes before the performance and then decides how to present each song or piece of music. During the performance itself, the technician makes hundreds of decisions affecting the mix and volume of sound. Tr. of Oral Arg. 13. The music is played immediately after each decision. There is, of course, no time for appeal in the middle of a song. As a result, no court ever determines that a particular restraint on speech is necessary. The city's admission that it does not impose sanctions on violations of its general sound ordinance because the necessary litigation is too costly and time consuming only underscores its contempt for the need for judicial review of restrictions on speech. *Id.,* at 5. With neither prompt judicial review nor detailed and neutral standards fettering the city's discretion to restrict protected

---

[8] Of course, if the city always defers to a performer's wishes in sound mixing, then it is difficult to understand the need for a city technician to operate the mixing console. See Tr. of Oral. Arg. 12 (city concedes that the possibilities for a confrontation over volume are the same whether the city technician directly controls the mixing console or sits next to a performer's technician who operates the equipment). Conversely, if the city can control sound only by using its own equipment and technician, then it must not be heeding all the performer's wishes on sound mixing.

speech, the Guidelines constitute a quintessential, and unconstitutional, prior restraint.

## III

Today's decision has significance far beyond the world of rock music. Government no longer need balance the effectiveness of regulation with the burdens on free speech. After today, government need only assert that it is most effective to control speech in advance of its expression. Because such a result eviscerates the First Amendment, I dissent.