McAULIFFE, District Judge
(concurring).
I agree with and concur in Judge Lipez’s reasoning and conclusion — that the record *121 requires further development and additional narrow-tailoring analysis remains to be done. However, I am less confident than Judge Lipez that the City of Newport’s amplification ban is content neutral. The record discloses that the City’s sole intent in imposing the license restrictions at issue here was to limit the volume of sound emanating from Asterix & Obelix, in an effort to accommodate its residential neighbors. But, by banning all amplified music, the City effectively, albeit unwittingly, banned a whole host of musical instruments and, necessarily, the unique musical messages that can only be produced by those instruments. And, ironically, the ban will not necessarily insure an acceptable level of noise control — Casey could, for example, sing to the accompaniment of snare drums, but not amplified flutes.
In the world of modern music, “amplified” is not synonymous with “made louder.” Electronic musical instruments can only produce sound through a process of electronic amplification, but those instruments are not inherently louder than acoustic or unamplified instruments. A modern synthesizer, for example, can make sound only by means of electronic amplification, yet that amplified instrument easily and faithfully mimics the sounds produced by a wide range of acoustic instruments such as pianos, harps, flutes, acoustic guitars, violins, drums, etc. Moreover, the synthesizer can reproduce those musical sounds as softly and quietly as desired. Yet, the synthesizer falls within the City’s ban. An electronically amplified Aeolian Harp can produce the same “soft floating witchery of sound” as nature’s own, but the volume is more easily controlled on the amplified version.
So, while the City did not impose the amplification ban because of any overt disagreement with the messages conveyed by amplified musical instruments, thus, arguably, making the ban content neutral, I believe the ban is sufficiently over-reaching to give rise to what the Supreme Court referred to in Ward v. Rock Against Racism, 491 U.S. 781, 792, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), as an argument of “much force,” i.e., that the City has imper-missibly interfered with the artistic judgment of performers at A & O. In Ward, the Court noted that “[a]ny governmental attempt to serve purely esthetic goals by imposing subjective standards of acceptable sound mix on performers would raise serious First Amendment concerns.... ” Id. at 793, 109 S.Ct. 2746. Here, the City’s regulation of expressive activity within A & O may well not be content neutral because it appears to impose subjective standards of instrument selection on performers and may not be “justified without reference to the content of the regulated speech,” id. at 791, 109 S.Ct. 2746 (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)), notwithstanding the absence of official disagreement with the artistic messages conveyed by amplified instruments. See Police Dept. of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (holding that picketing ban imposed to prevent disruption of school was not content neutral when the ban allowed picketing on some topics but not others); Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (same).
The governmental regulation in Ward was not intended to, and did not in fact, interfere with artistic expression. But here,, the regulation singles out certain musical instruments and thus “has a direct and immediate effect on the expression at issue,” by suppressing it, and does so without any apparent justification, given the substantial disparity between the ban’s ex *122 pansive reach and the noise-control interests the ban purports to serve.
With that reservation — that the license restriction may not be content neutral — I join in Judge Lipez’s opinion.