*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0210p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

H.D.V.–GREEKTOWN, LLC; 415 EAST
CONGRESS, LLC; and K AND P
INCORPORATED, fdba Deja Vu, dba Zoo Bar,
                    *Plaintiffs-Appellants,*

v.

CITY OF DETROIT,
                    *Defendant-Appellee.*

Nos. 08-1329/1361

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-11282—Julian A. Cook, Jr., District Judge.

Argued: March 11, 2009

Decided and Filed: June 12, 2009

Before: BOGGS, Chief Judge; GILMAN and ROGERS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Bradley J. Shafer, SHAFER & ASSOCIATES, P.C., Lansing, Michigan, for
Appellants. Jeffrey S. Jones, CITY OF DETROIT LAW DEPARTMENT, Detroit,
Michigan, for Appellee. **ON BRIEF:** Bradley J. Shafer, Andrea E. Pritzlaff, SHAFER &
ASSOCIATES, P.C., Lansing, Michigan, for Appellants. Jeffrey S. Jones, CITY OF
DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. This case involves a challenge to the City
of Detroit's zoning and sign ordinances by an adult cabaret operating in the City's central
business district. The plaintiffs allege that the City has utilized the challenged ordinances
to prevent the cabaret from transferring its business to a new owner and from erecting
signage desired by the present owner.

1

Although the district court held that the adult-use zoning provisions were unconstitutional and ordered the City to revise them, it denied the plaintiffs' requested injunctive and declaratory relief as to the zoning ordinances. As for the sign ordinances, the court found that the challenged provisions were facially constitutional, but were unconstitutional as applied to the plaintiffs. It accordingly granted the injunctive and declaratory relief regarding the plaintiffs specifically, but declined to generally enjoin the City from otherwise enforcing the sign ordinances.

The plaintiffs timely appeal the district court's denial of their requested injunctive and declaratory relief, as well as the court's holding that the sign ordinances were not facially unconstitutional. For the reasons set forth below, the district court's denial of the plaintiffs' request that it declare the present owner's operation of the cabaret lawful and enjoin the City from enforcing the adult-use provisions of the zoning ordinances is **REVERSED** and **REMANDED** for the entry of the plaintiffs' requested injunctive and declaratory relief. With respect to the sign ordinances, the district court's orders are **AFFIRMED** except that the court's grant of injunctive and declaratory relief is modified to allow a substitute business name as detailed below.

## I.  BACKGROUND

**A.     The zoning-ordinance appeal**

### *1.      Factual and procedural background*

K and P Incorporated (K&P) has operated an adult cabaret in downtown Detroit (the Premises) since 1986. It obtained a "Group D Adult Cabaret" license from the City in 1994, which allowed it to present "adult entertainment" on the Premises. The cabaret, then operating under the name "Legends," started featuring topless female dancers in 1997.

In 1998, the Michigan legislature revised the state's Liquor Control Code and created what became known as a "Topless Activity Permit" (TAP) for liquor-licensed establishments presenting topless female dance entertainment. K&P, which already possessed a Class C Liquor License, subsequently applied for and was issued a TAP by the Michigan Liquor Control Commission (MLCC).

The City later revised the Detroit Zoning Ordinance (DZO) to further regulate the location of adult entertainment establishments, including "adult cabarets." Specifically, the amendments prohibited the establishment of any new adult businesses on land zoned in the B6-General Services zoning district within the "Central Business District" of Detroit (i.e., downtown). Because K&P's adult cabaret was located on land zoned as B6 within the Central Business District, the amendments rendered K&P's business a nonconforming use under the DZO. This change was confirmed in letters from the City Planning Commission to the City Council in October 1999 and July 2003, with both letters specifically referring to the Premises. But the use of the Premises as an adult cabaret was permitted to continue as a grandfathered nonconforming use pursuant to the then-existing Section 51.0000 of the DZO.

On October 2, 2002, H.D.V.–Greektown, LLC (H.D.V.) entered into a conditional purchase agreement with K&P to purchase all of K&P's assets. The following year, 415 East Congress, LLC purchased the Premises from Hampton Holdings, Inc. H.D.V. planned to lease the Premises from 415 East Congress for the purposes of operating an adult cabaret in the same manner as K&P. Among the assets purchased were K&P's Class C Liquor License and TAP.

H.D.V. applied to the MLCC in December 2002 for the transfer of K&P's liquor license and TAP. In response, the City took the position that the City Council was required to approve the transfer of all liquor licenses and associated permits issued by the MLCC. After H.D.V. received the consent of the MLCC and approval by the Detroit Police Department, the transfer applications were referred to the Detroit Consumer Affairs Department for submission to the City Council. The transfer applications lingered, however, because the City Council refused to consider them. Some City officials took the position that, as a result of one of the conditions of the land-use grant issued to K&P in 1994, K&P was limited to providing only *male* adult dance entertainment. This limitation became known in later litigation as "Condition 18."

K&P, H.D.V., and 415 E. Congress (collectively, the "plaintiffs") filed suit in federal court against the City in December 2003. The basis for the suit was the City Council's failure to act on H.D.V.'s transfer applications and the consequent threat of enforcement

actions against K&P as a result of the language of Condition 18. That litigation ended with the parties stipulating to an order granting declaratory relief that held Condition 18 to be an unenforceable restraint on speech in violation of the First Amendment. The order declared that the City "may not invoke against or apply to the Plaintiffs Condition 18 of the land use grant." All of the plaintiffs' other claims were dismissed without prejudice in order to permit the City Council to reconsider its position in light of the inapplicability of Condition 18.

Despite the court's order, the City Council refused to take up H.D.V.'s transfer applications for almost three more years. The City Council did, however, pass resolutions in 2003 and 2004 that applied to application requests for the approval and/or transfer of liquor licenses and related permits, including TAPs (the "Resolutions"). These Resolutions precluded the granting of MLCC transfer applications for licenses or permits that had been issued for premises considered to be nonconforming uses under the terms of the DZO.

The City also began to issue zoning violation notices against K&P. In February 2004, the first notice ordered K&P to "[v]acate and desist in the use of [the Premises] as an Adult Entertainment establishment or submit application to the Board of Zoning Appeals for the expansion of the nonconforming use as required per Ordinance 390G, Section 56.0000." Upon K&P's appeal to the Board of Zoning Appeals (BZA), the City's Law Department moved to dismiss the violation notice "for the reason that there are inaccuracies in the violation."

A second violation notice, issued in April 2004, ordered K&P to

Cease and Desist in the expanded use as an Adult Entertainment Establishment (Cabaret 'D') from occasional limited use of Cabaret 'D' to a seven day use from one entertainment area to multi-area and multi-story entertainment. Board of Zoning Appeals approval is required to expand a non-conforming use. Per 390G Zoning Ord. Sec. 55.0100.

K&P also appealed the second violation notice to the BZA. At the hearing before the BZA, the City maintained—despite the ruling of the district court to the contrary—that it could still enforce Condition 18 against K&P.

The BZA ruled unanimously in favor of K&P on the second violation notice. It stated, however, that if the Detroit Buildings and Safety Engineering Department (B&SE)

believed that K&P had illegally expanded the nonconforming use of the Premises, then the appropriate procedural avenue would be to initiate a "Show Cause" proceeding.

Fearing that the City would attempt to revoke the land-use grant in future proceedings, K&P significantly curtailed dancing entertainment on the Premises in 2005. But in March 2006, by which time the City had still not taken action on the transfer applications, the plaintiffs refiled their lawsuit against the City.

The City Council finally took up H.D.V.'s transfer request after the lawsuit had been filed. Because K&P was operating as a nonconforming use, the City Planning Commission took the position that H.D.V.'s petition would have a "presumption of disapproval by the Council." On November 15, 2006, the City Council voted to deny H.D.V.'s transfer application.

### 2.        *The plaintiffs' first motion for partial summary judgment*

The plaintiffs filed their first motion for partial summary judgment in January 2007, seeking an order declaring the adult-use provisions of the DZO unconstitutional and permanently enjoining their enforcement. They argued that the challenged zoning ordinances were unconstitutional, both facially and as applied, because they imposed a prior restraint on speech protected by the First Amendment.

The district court granted the motion in part, holding that the challenged provisions of the DZO were unconstitutional under the First and Fourteenth Amendments. It accordingly directed the City to "revise its zoning ordinance forthwith to bring it into compliance with the First Amendment." But the court denied the motion without prejudice to the extent that the plaintiffs requested (a) a permanent injunction barring enforcement of the challenged provisions, and (b) a declaration that K&P's business at its current location was a lawful conforming use for zoning purposes. The court reasoned that, in light of its order that the City revise the zoning ordinance, those rulings were "at this point . . . not necessary."

After the district court's order, the plaintiffs filed a timely motion to alter or amend the judgment, which the court denied. The plaintiffs then timely appealed the court's ruling

relating to their first motion for partial summary judgment. That appeal—one of two appeals by the plaintiffs currently before us—is docketed as Case No. 08-1329.

**B.     The sign-ordinance appeal**

### 1.     *Factual and procedural background*

In January 2004, shortly after the resolution of the first federal lawsuit, K&P changed its operating name to "Deja Vu." K&P and 415 East Congress then began the process of obtaining the City's approval to erect new signage on the Premises. They contracted with MLS Signs, Inc., a sign installation company, to construct the permanent signs. MLS Signs submitted a sign application (the initial application) to the B&SE. The initial application requested one wall sign measuring eight feet by two feet that would read "Deja Vu" and that complied with all code provisions.

While the initial application was pending with the B&SE, K&P obtained a series of temporary sign permits from the City to allow for temporary signs on the Premises announcing the new name of the business. In May 2004, before it had taken any action on the initial application, the B&SE issued a violation notice demanding that K&P take down a cloth/vinyl banner that it was using as a sign pursuant to the temporary sign permit then in place. In response, and in the absence of any action by the B&SE on the initial application, K&P filed another application for a temporary sign stating "Deja Vu Now Open." The request was granted, thus allowing a temporary sign for 15 days.

K&P learned in August 2004 from a City building inspector that one reason for the delay in acting on the initial application was that the B&SE was waiting for a BZA decision letter arising from a hearing regarding the Premises. That BZA hearing, discussed in Part I.A.1. above, dealt with K&P's alleged "expansion" of its nonconforming use. The BZA ruled unanimously in K&P's favor, but no sign application was discussed at the hearing.

Believing that its business was being damaged by its zoning and sign-ordinance issues with the City, K&P decided in late 2004 to change the name of the establishment operating at the Premises to "Hustler." With the original application still pending, MLS Signs submitted a Revised Application for Permit for Erection of Signs and Poster Boards

(the revised application) to the B&SE in December 2004. The revised application requested permission to erect two wall signs. One sign would be 51 feet, 3 inches long and 13 feet high, and would read "Hustler." The other would be 12 feet, 7.5 inches long and 6 feet, 6.5 inches wide, would read "Hustler" on the top portion of the sign, and would have an electronic message center below it. These proposed signs complied with all code provisions.

As of April 2007, no action had been taken on either the initial or revised sign applications. K&P, seeking to avoid any economic harm to its trademarked and copyrighted trade names, temporarily changed the name of its establishment to "Zoo Bar" pending future developments.

### 2.      *The second motion for partial summary judgment*

The plaintiffs' 2006 lawsuit, in addition to challenging the constitutionality of the City's adult-use zoning ordinances, also alleged that the City's sign ordinances were unconstitutional. By April 2007, four years had passed since the filing of the initial sign application, and three since the revised application, without any action by the City. The plaintiffs filed a motion for partial summary judgment that month, arguing that the City's sign ordinances were unconstitutional both facially and as applied. They requested that the district court (a) enjoin the City from enforcing the challenged provisions, (b) declare that the plaintiffs were legally entitled to erect the signs described in the revised application, and (c) permanently enjoin the City from interfering in any manner with the plaintiffs' erection of the signs.

The district court issued an order granting in part and denying in part the plaintiffs' motion. It held that the City's sign ordinances were not unconstitutional on their face, and therefore declined to permanently enjoin enforcement of those ordinances. The court did, however, hold that the City's failure to act on the applications within a reasonable time was unconstitutional as applied, and thus enjoined the City from preventing the plaintiffs' erection of their desired signs.

In March 2008, the plaintiffs timely appealed the portions of the district court's ruling on the second motion for partial summary judgment that were unfavorable to them.

That appeal is docketed as Case Number 08-1361 and has been consolidated with the plaintiffs' zoning-ordinance appeal.

## II.  ANALYSIS

### A.      Standing

#### 1.      *Standard of review and constitutional requirements*

The City argues that the plaintiffs lack standing to challenge the constitutionality of its zoning and sign ordinances.  We review issues of standing de novo.  *Lynch v. Leis*, 382 F.3d 642, 645 (6th Cir. 2004).  Article III of the United States Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  To satisfy this "case-or-controversy" requirement, a plaintiff must establish three elements: (1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue, meaning that the injury must be fairly traceable to the defendant's action; and (3) a likelihood that the injury would be redressed by a favorable decision of the court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

#### 2.      *Application*

##### a.      *The adult-use zoning ordinances*

The City contends that the plaintiffs lack standing to contest the adult-use provisions of the zoning ordinances because they cannot show that they have suffered an injury-in-fact. Specifically, the City states that the challenged adult-use provisions have never been applied to K&P, which has been able to operate its adult cabaret unimpeded by the City.  The City also asserts that H.D.V. cannot claim standing because the rejection of its application for the transfer of K&P's liquor licenses and TAP was not due to the application of the adult-use zoning provisions declared unconstitutional by the district court.

We conclude that these standing arguments are meritless.  To start with, the notion that the plaintiffs have not been injured by the challenged zoning provisions strains credulity. K&P's sale of its business to H.D.V. is conditioned on the transfer of all applicable licenses and permits.  The City Council's stated reason for denying the transfer of the TAP to H.D.V.

was the purported nonconforming nature of K&P's use of the Premises.  Both K&P and H.D.V. were therefore harmed when their desired transaction was precluded by the City Council's inaction on—and ultimate denial of—the transfer application.

And even we were to accept the City's contention that its actions toward the plaintiffs were not related to the zoning ordinances, the plaintiffs would still have had standing to challenge the ordinances due to their potential to chill First Amendment-protected speech.  The district court correctly noted that in cases where, as here, businesses protected by the First Amendment must apply for special zoning approval as a condition of operating, this renders the zoning scheme equivalent to a licensing process that effectuates a prior restraint upon protected expression.  *See Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361-1362 (11th Cir. 1999) (finding standing where the plaintiff alleged that the zoning scheme in question functioned as a prior restraint on adult businesses).  Facial challenges are appropriate in such situations because "every application of the [law] creates an impermissible risk of suppression of ideas."  *FW/PBS v. City of Dallas*, 493 U.S. 215, 223-24 (1990) (brackets and internal quotation marks omitted).  As this court has noted,

> when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subjected to the law may challenge it facially without the necessity of applying for, and being denied, a license.  Such a licensing requirement constitutes a prior restraint and may result in censorship.  Thus, the prior restraint of a licensing provision coupled with unbridled discretion itself amounts to an actual injury.

*Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007) (citations and internal quotation marks omitted).  We accordingly reject the City's standing challenge regarding the adult-use provisions of the zoning ordinances.

### b.    The sign ordinances

The City further argues that the plaintiffs (a) have no standing to challenge those portions of the sign ordinances that do not relate to business signs, and (b) suffered no injury-in-fact related to the business-sign ordinances.  Its argument is based on the premise that the plaintiffs withdrew their application for a sign permit and failed to provide the City with the additional information it requested.  The plaintiffs respond that their challenge

relates to the constitutionality of the application *process*, which applies to all signs, and that the district court correctly found that they had suffered an injury-in-fact.

As the district court noted, the City's standing arguments regarding the plaintiffs' challenges to inapplicable portions of the sign ordinances may be more accurately characterized as a *severability* argument. The City's argument boils down to a claim that, even if the plaintiffs have standing to challenge the constitutionality of the business-sign-related ordinances, the constitutionality of other sign ordinances relating to political or advertising signs, for example, would not be implicated. Because we hold in Part II.C.3. below that the sign ordinances are not facially unconstitutional, we need not reach the City's severability argument.

Focusing now on the City's argument pertaining to the business-sign ordinances—that the plaintiffs suffered no injury in fact due to the City's inaction on their application—we conclude that the argument is without merit. As a direct parallel to the adult-use zoning ordinances, the plaintiffs argued both below and on appeal that the sign ordinances amount to licensing schemes. Facial challenges to such alleged licensing schemes, for the reasons discussed above, do not require a showing that the plaintiffs were denied a permit. *See Prime Media*, 485 F.3d at 351.

The City further contends that the plaintiffs suffered no injury in fact because they withdrew their sign-permit application in 2006 or 2007. Specifically, the City cites an acknowledgment in a sworn declaration by Mark Zoltowski, an MLS Signs employee, that he had received a telephone call on September 11, 2006 from a representative of the B&SE who was inquiring about the status of the K&P's revised application regarding the proposed "Hustler" signs. Zoltowski, noting that the permit application was nearly two years old, "assumed that the client did not wish to pursue the application further" and advised the B&SE representative that the application should be withdrawn. The City also points out that the plaintiffs never responded to a July 2007 B&SE letter stating that the B&SE had been informed that the plaintiffs wished to withdraw their application, but leaving open the possibility of processing the application conditioned upon receipt of additional information.

These contentions by the City are arguably contrary to its representations before the district court. For instance, in a response in opposition to the plaintiffs' motion for a page- and time-limit extension for briefing on the issue, the City stated that "[t]he [plaintiffs'] proposed supplemental exhibits [which pertained to the application-withdrawal issue] have nothing to do with the City's legal arguments with respect to standing . . . ." These seemingly inconsistent positions implicate the doctrine of judicial estoppel. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.")

And even if the City's is not estopped on this issue, the district court correctly noted that the plaintiffs never received the B&SE's July 2007 letter. Moreover, by the time the B&SE sent the letter, more than two and a half years had already passed since the date of the original application. We thus reject the City's application-withdrawal argument.

**B.      The propriety of injunctive relief in light of the district court's holding that the adult-use zoning provisions are facially unconstitutional**

When examining a district court's denial of an injunction, we review its factual findings under the clear-error standard and its legal conclusions de novo. *ACLU v. Taft*, 385 F.3d 641, 645 (6th Cir. 2004). But the district court's ultimate decision regarding injunctive relief is reviewed under the "highly deferential" abuse-of-discretion standard. *Id.* (internal quotation marks omitted).

The district court held in its order on the plaintiffs' first motion for partial summary judgment that the adult-use provisions of the City's zoning ordinances were unconstitutional prior restraints on speech. It accordingly ordered the City to revise the zoning ordinances to bring them into compliance with the First Amendment. Despite its holding that the challenged provisions were unconstitutional, however, the court declined to grant the plaintiffs' request to permanently enjoin the enforcement of the provisions by the City or to declare the adult cabaret a lawful existing use. The plaintiffs now appeal the court's denial of their requested injunctive relief.

In response, the City advances two arguments. It first contends that the plaintiffs were not entitled to an injunction because they cannot show that they would suffer irreparable harm without its issuance. This argument echoes the City's standing argument that the plaintiffs suffered no injury-in-fact because they were not actually affected by the application of the adult-use provisions at issue. Second, the City argues—and stresses most heavily—that the district court erred in concluding that the provisions in question were unconstitutional.

But the City's arguments on the underlying constitutionality of the challenged provisions are not properly before us in light of the procedural posture of the plaintiffs' appeal. The district court's order on the plaintiffs' first motion for partial summary judgment was not a final order within the meaning of 28 U.S.C. § 1291. So the only avenue for an immediate appeal of the order would have been an interlocutory appeal under 28 U.S.C. § 1292(A)(1), which addresses decisions granting or denying injunctive relief. As the City conceded in its response to the plaintiffs' motion to strike portions of its appellate response brief, "this section [§ 1292(A)(1)] does not apply to the District Court's finding on the constitutionality of the adult use regulations." The City, in sum, reserved the right to appeal this finding of the district court, but only after the district court has issued a final order within the meaning of 28 U.S.C. § 1291.

The question of whether the district court abused its discretion by declining to grant the requested injunctive relief yields a straightforward answer. As the Supreme Court has declared, a state law may not be enforced if it conflicts with federal law. *Riley v. Kennedy*, 128 S. Ct. 1970, 1986 (2008) (citing U.S. Const. art. VI, cl. 2.). And this court has repeatedly held that facially unconstitutional laws will not be enforced. *See Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir. 2000) ("If a facial challenge is upheld, then the state cannot enforce the statute against anyone."); *37712, Inc. v. Ohio Dept. of Liquor Control*, 113 F.3d 614, 618 n.7 (6th Cir. 1997) ("A state statute or local ordinance which by its terms compels unconstitutional results is 'facially' unconstitutional and hence is incapable of any valid application."). The district court's refusal to enjoin the City from enforcing the challenged provisions of its zoning ordinances was thus clearly an abuse of discretion, assuming that the ordinance is indeed unconstitutional.

Turning now to the plaintiffs' argument that K&P's operation on the Premises should be declared a lawful conforming use, we agree that the district court abused its discretion by declining to grant that relief pending entry of a final judgment. Once the adult-use zoning ordinances were declared facially unconstitutional, K&P became entitled to use its property for any lawful purpose. The Tenth Circuit has explained the governing principle as follows:

> If the zoning ordinance is void for want of the procedural safeguards of notice and hearing, etc., the properties intended to be affected thereby are unzoned and the property owners may proceed with any other lawfully intended use. In such cases, the court is limited to the remedy of declaring the zoning ordinance void and finding that the property owner affected is entitled to use his property for any lawful purpose without regard to the void zoning ordinance.

*Carter v. Salina*, 773 F.2d 251, 255 (10th Cir. 1985). We accordingly conclude that, so long as the district court continues to hold the ordinances unconstitutional, its failure to declare K&P's use of the Premises lawful constitutes an abuse of discretion.

**C.      The facial constitutionality of the sign ordinances**

The next set of issues on appeal arise from the plaintiffs' second motion for partial summary judgment pertaining to the sign-permit application process. Although the district court concluded that the City's sign ordinances were not unconstitutional on their face, it did hold that the sign-permit application process was unconstitutional as it had been applied to K&P. The court accordingly declined to enjoin all enforcement of the sign ordinances by the City, but declared that K&P was legally entitled to erect its signs and enjoined the City from preventing it from doing so. On appeal, the plaintiffs argue that the sign ordinances did, in fact, amount to a facially unconstitutional prior restraint and that the City should therefore be enjoined against enforcing the ordinances. We will review the district court's legal conclusions de novo, while reviewing its factual findings under the clear-error standard. *Taft*, 385 F.3d at 685.

### 1.   *Description of the sign ordinances*

The district court summarized the applicable provisions of the sign ordinances in its February 14, 2008 summary judgment order. *See H.D.V. - Greektown, LLC v. City of Detroit*, No. 06-11282, 2008 U.S. Dist. LEXIS 10940, at *9-13 ( E.D. Mich. Feb. 14, 2008). To avoid a lengthy redundancy, we refer the reader to the district court's order for the details of the sign-ordinances.

### 2.   *The applicable analytic framework*

In deciding whether the sign ordinances are facially unconstitutional, we must first determine which of two possible analytical frameworks to apply. The first framework is that announced by the Supreme Court in *Freedman v. Maryland*, 380 U.S. 51, 58-59 (1965), and elaborated upon in later cases. Under the *Freedman* framework, "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1998).

The first way that an ordinance can vest "substantial power" in local officials to engage in content-based discrimination is by placing "unbridled discretion in the hands of a government official or agency." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990). To avoid granting such unbridled discretion, ordinances "must contain precise and objective criteria on which they must make their decisions; an ordinance that gives too much discretion to public officials is invalid." *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361 (11th Cir. 1999) (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969)).

Second, licensing ordinances must require prompt decisionmaking by the officials reviewing applications. "An ordinance that permits public officials to effectively deny an application by sitting on it indefinitely is also invalid." *Lady J*, 176 F.3d at 1361 (citing *Freedman*, 380 U.S. at 56-57). Ordinances that do not set reasonable time limits on the decisionmaker create the risk of indefinitely suppressing permissible speech and are therefore facially unconstitutional under *Freedman*. *FW/PBS*, 493 U.S. at 227.

The plaintiffs argued before the district court—and continue to argue on appeal—that the City's sign ordinances are facially unconstitutional under *Freedman.* They reason that the ordinances vest unbridled discretion in the City to grant or deny permits because the ordinances do not contain specific grounds for the denial of sign-permit applications. The plaintiffs also note that the sign ordinances fail to place any time limits on the City for acting on sign-permit applications.

But the district court agreed with the City that the *Freedman* framework did not apply. The court instead held that the correct standard was contained in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002). There, the Supreme Court determined that the *Freedman* framework did not apply to content-neutral, "time, place, and manner" restrictions. *Id.* at 322. Rather, the Court held that the parkland-use ordinance before it was subject to the requirement that it contain "adequate standards to guide the [licensing] official's discretion and render it subject to effective judicial review." *Id.* at 323. The *Thomas* Court also determined that a content-neutral permit scheme (a) "must not be based on the content of the message," (b) "must be narrowly tailored to serve a significant governmental interest," and (c) "must leave open ample alternatives for communication." *Id.* at n.3 (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992)).

In order to decide which precedent to apply, we must determine whether the City's sign ordinances are content based or content neutral. *See Thomas*, 534 U.S. at 322; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) (stating that the constitutional scrutiny applied to a regulation depends upon whether it is content based or content neutral). "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted). An ordinance is not a content-based regulation of speech if (1) the regulation controls only the places where the speech may occur, (2) the regulation was not adopted because of disagreement with the message that the speech conveys, or (3) the government's interests in the regulation are unrelated to the content of the affected speech. *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 432 (4th Cir. 2007) (paraphrasing *Hill v. Colorado*, 530 U.S. 703, 719-20 (2000)) (internal punctuation omitted).

The plaintiffs argue that the ordinances at issue are content based because they distinguish between various types of signs—and thus various types of protected speech—by content. For instance, the "Signs" chapter of the DZO contains separate definitions for "advertising signs," § 61-6-3, "business signs," § 61-6-7, and "political signs," § 61-6-18. The same chapter imposes different height requirements on business and identification signs, § 61-6-35, than it does for real estate, construction, and political signs, § 61-6-41, or advertising signs, § 61-6-57. Finally, the plaintiffs note that sign-permit applications require that the content of the proposed signage be identified.

The plaintiffs' arguments regarding the supposed distinctions between the various types of speech in the sign ordinances are unpersuasive. There is simply nothing in the record to indicate that the distinctions between the various types of signs reflect a meaningful preference for one type of speech over another. As the district court noted, this court held in *Wheeler v. Commissioner of Highways*, 822 F.2d 586, 591 (6th Cir. 1987), that "the on-premises [e.g., business]/off-premises [e.g., advertising] distinction does not constitute an impermissible regulation of content just because the determination of whether a sign is permitted at a given location is a function of the sign's message." We see no reason why the rationale in *Wheeler* regarding the on-premises/off-premises distinction would not extend to the types of technical distinctions in the City's sign ordinances cited by the plaintiffs.

Worth noting, however, is the Eleventh Circuit's decision in *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1266 (11th Cir. 2005), where it held that Neptune Beach's sign code *was* content-based because of its varying treatments for different sorts of signs. An example cited in *Solantic* is arguably relevant to this case as well:

> [M]any of the sign code's exemptions are plainly content based. For example, exemption (3) applies to flags and insignia only of a "government, religious, charitable, fraternal, or other organization." Thus, a government or religious organization seeking to fly its flag may do so freely, whereas an individual seeking to fly a flag bearing an emblem of his or her own choosing would have to apply for a permit to do so, and would have to abide by all of the restrictions enumerated in § 27-581. For example, the government tax collector's office could display a flag reading, "Stop Tax Evasion," whereas an individual homeowner could not display a flag saying, "Stop Domestic Violence," since § 27-581(13) prohibits the use of the word "stop" in any nonexempt, nongovernmental sign.

*Id.* at 1263. The court concluded that, "because some types of signs are extensively regulated while others are exempt from regulation based on the nature of the messages they seek to convey, the sign code is undeniably a content-based restriction on speech." *Id.* at 1266.

The *Solantic* court's classification of the sign regulations before it as content-based appears to us to reflect an overly narrow conception of the definition of content-neutral speech. The ordinances at issue in *Solantic* seem to satisfy all three of the possible independent bases for content neutrality listed by the Supreme Court in *Hill* (i.e., (1) the regulation is not a regulation of speech, but controls only the places where the speech may occur; (2) the regulation was not adopted because of disagreement with the message that the speech conveys; or (3) the government's interests in the regulation are unrelated to the content of the affected speech). *Hill*, 530 U.S. at 719-20. Indeed, we doubt that there are many municipal sign ordinances around the country that would *not* be classified as content-based prior restraints under *Solantic.* Because *Solantic* appears to employ an analysis that is inconsistent with *Hill* and *Thomas*, we shall not rely on its rationale.

The plaintiffs' argument regarding the necessity of listing a sign's content on a permit application also fails. Although they are correct in pointing out that the sign-permit application contains an item labeled "Wording," they can point to no provision in any of the sign ordinances that allows the City to reject an application due to the message it contains. The sign-permit application, taken as a whole, properly focuses on the physical characteristics and placement of proposed signs, which are entirely legitimate governmental concerns in this context. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 509-10 (1981) (holding that safety and aesthetics are legitimate government interests to further through sign ordinances).

In sum, there is no evidence that the City's sign ordinances discriminate based upon content. We will thus apply the *Thomas* standard for content-neutral time, place, and manner restrictions.

### 3.      *Application of* Thomas

As described above, the Supreme Court held in *Thomas v. Chicago Park District*, 534 U.S. 316, 323 & n.3 (2002), that an ordinance (1) must contain adequate standards to guide the official's decision, (2) must not be based on the content of the message, (3) must be narrowly tailored to serve a significant government interest, and (4) must leave open ample alternatives for communication. The sign ordinances in question satisfy all four of these factors.

First, the sign ordinances contain narrow, objective, and definite nondiscretionary criteria. The ordinances contain very particular requirements for signs, including limitations on size, height, location, area, and setback conditions. Numerous other cases involving sign ordinances have found similar criteria to be sufficient to withstand constitutional scrutiny. *See, e.g.*, *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 435 (4th Cir. 2007); *Granite State Outdoor Advertising, Inc. v. City of St. Petersburg*, 348 F.3d 1278, 1281 (11th Cir. 2003). On their face, the sign ordinances contain enough specificity to render the decision of whether to grant or deny an application virtually ministerial. The first *Thomas* element—that the ordinances contain adequate standards to guide the City's decision—is therefore satisfied.

Second, as discussed above, nothing in the text of the sign ordinances indicates that content is a factor in the approval process. The only distinctions drawn between various types of speech in the ordinances are the classifications of different types of signs, such as "business" or "advertising," primarily for purposes of organization.

Third, goals such as aesthetics and safety are legitimate governmental interests. *Metromedia*, 453 U.S. at 509-10. Business signs hold the potential to distract or impede the view of drivers. Excessive signage can also diminish the beauty of the surrounding area. A sign's size and structure can also affect the safety of its construction. The sign ordinances in question reflect the City's justified concern over these interests.

According to the plaintiffs, however, the ordinances are not narrowly tailored to serve those interests because they do not specifically identify the grounds on which the B&SE may deny an application. The City responds that the ordinances permit the denial of

a permit only on the grounds outlined therein. In *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988), the Supreme Court cautioned that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Thus, "in evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered." *Ward v. Rock Against Racisim*, 491 U.S. 781, 795-96 (1989) (citation and internal quotation marks omitted).

The "Business Signs" section of the Detroit Code states that its purpose

> is to regulate business signs within the City of Detroit; to limit the abundance of signs in order to reduce motorist distraction and loss of safe sight distance; to promote public convenience; to preserve property values; to support and complement land use objectives as set forth in the city's master plan and ordinances; and to enhance the aesthetic appearance and quality of life within the city.

Detroit Code § 3-7-1. We are thus bound by *DeBartolo* and *Ward* to accept the construction of the ordinances offered by the City. Pursuant to that construction—that the ordinances permit the denial of a permit only on the grounds outlined therein—the sign ordinances satisfy the third, "narrowly tailored" *Thomas* element.

Finally, we must consider whether the restrictions imposed by the sign ordinances "leave open ample alternatives for communication." *Thomas*, 354 U.S. at 323 n.3. The ordinances permit the erection of signs that meet the City's stated criteria for height, size, and other factors. Businesses are also free to use any of the myriad other forms of available communication (e.g., print, television, radio, etc.) to advertise. The ordinances therefore satisfy the fourth *Thomas* element.

Application of the four *Thomas* elements discussed above would generally conclude our analysis in favor of the constitutionality of the ordinances. But the plaintiffs contend, as they did below, that *Thomas* also requires that content-neutral licensing ordinances (1) contain a brief, specified time limit, and (2) require the decisionmaker to specify the grounds for denying an application. The district court correctly declined to apply these additional elements.

In *Thomas*, the Supreme Court noted approvingly that the Chicago ordinance at issue, which governed the use of city parks by large groups, contained a 28-day deadline for processing applications and also provided that the Park District must clearly explain its reasons for denial. *Thomas*, 354 U.S. at 324. But the Court never stated that these additional factors were *requirements* to prevent a content-neutral regulation from being declared unconstitutional. Chicago's decision-deadline and rejection-basis provisions are more accurately understood as a sort of "icing on the cake," demonstrating that the challenged ordinance well exceeded the Court's newly enunciated standard. To read the Court's language otherwise would negate its earlier holding that content-neutral time, place, and manner restrictions need not contain *Freedman* safeguards. *Id.* at 322; s*ee S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1138 (9th Cir. 2004) ("To read [*Thomas* as requiring a time limit] would flatly contradict the decision's clear holding that time, place, and manner regulations need not contain the *Freedman* safeguards."); *Granite State Outdoor Advertising, Inc. v. City of St. Petersburg*, 348 F.3d 1278, 1281-83 (11th Cir. 2003) (holding that the absence of time limits for the municipality to process permit applications did not render a content-neutral sign ordinance unconstitutional); *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1328 (Fed. Cir. 2002) (limiting *Freedman's* procedural safeguards requirement to "explicit censorship schemes[,] which by definition [are] not content-neutral").

Because the City's sign ordinances—and the sign-permit application process derived from them—are content-neutral regulations that satisfy all four *Thomas* requirements, they are facially constitutional. We will therefore not disturb the district court's order holding to that effect. The plaintiffs were thus properly denied injunctive relief against the general enforcement of the sign ordinances.

**D.      Scope of injunctive relief on the plaintiffs' as-applied challenge to the sign ordinances**

We note, before concluding, that the injunctive and declaratory relief that the district court *did* grant to the plaintiffs may at this point be technically insufficient. The court's order provided as follows:

> [T]he Plaintiffs are legally entitled to erect the signs that were described on their sign permit application, and, in so doing, permanently enjoins the City of Detroit from preventing them from erecting and publishing these signs;

> provided, however, that the Plaintiffs' publication of the signs must fully
> conform with the existing ordinances, codes and related regulations.

*H.D.V. - Greektown, LLC v. City of Detroit*, 2008 U.S. Dist. LEXIS 10940 at *31. At oral argument, the plaintiffs indicated that they are no longer using the "Hustler" name previously listed on the sign applications and that they will accordingly need to erect signs bearing another name. Under the existing terms of the order, the plaintiffs would arguably be required to submit another sign application reflecting the new name, which the City could conceivably ignore again until the plaintiffs brought a new round of litigation. We therefore modify the district court's order to declare that the plaintiffs may legally erect signs on the Premises bearing whatever non-obscene business name they choose, as long as the signs otherwise conform with the most recent application on file regarding dimensions, lighting, and other characteristics governed by the sign ordinances. The City is enjoined from preventing the plaintiffs from doing so.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM IN PART** and **REVERSE IN PART** the two judgments of the district court. The district court's denial of the plaintiffs' request that it declare K&P's use of the Premises lawful and enjoin the City from enforcing the adult-use provisions of the zoning ordinances is **REVERSED** and **REMANDED** to the court for the entry of the plaintiffs' requested injunctive and declaratory relief regarding those provisions. Otherwise, the district court's orders on the plaintiffs' first and second motions for partial summary judgment are **AFFIRMED**, except that the court's grant of injunctive and declaratory relief regarding the sign ordinances shall be modified to allow a substitute business name as detailed above.