NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0647n.06

No. 13-3474

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 19, 2014
DEBORAH S. HUNT, Clerk

FRANK WAGNER,                           )
                                        )
        Plaintiff-Appellee,             )
                                        )
v.                                      )  ON APPEAL FROM THE UNITED
                                        )  STATES DISTRICT COURT FOR THE
                                        )  NORTHERN DISTRICT OF OHIO
CITY OF GARFIELD HEIGHTS, OHIO;         )
WILLIAM WERVEY                          )
                                        )
        Defendants-Appellants.          )

Before: BOGGS, NORRIS, and WHITE, Circuit Judges.

The City of Garfield Heights ("City") limits the size of signs, political and otherwise, that residents may place on their lawns. Frank Wagner, a City resident, placed a political sign on his lawn that was larger than the City allows. The district court found that the City's restriction on Wagner's political speech violates the First Amendment. Because we conclude that the ordinance imposes a content-neutral restriction on the time, place, and manner of speech, and because the City has satisfied the intermediate scrutiny applicable to such regulations, we reverse.

I

A

Garfield Heights is a municipality located in Cuyahoga County, Ohio and forms part of the Greater Cleveland area. Chapter 1140 of the City's Codified Ordinances regulates the design and placement of signs in the City. *See* Garfield Heights, Ohio, Codified Ordinances ch. 1140.01

1

(2013), *available at* http://www.conwaygreene.com/GarfieldHts/lpext.dll?f=templates&fn=main-h.htm&2.0.  The City regulates signs for these reasons:

> (a) To maintain high quality districts of all land uses, and attractive public and private facilities of all types, by permitting only signs appropriate to their environs;
> . . .
> (c) To eliminate any conflict between traffic control signs and other signs which would be hazardous to the safety of the motorizing public or pedestrians;
> (d) To control the design and size of all signs so that their appearance will be aesthetically harmonious with an overall urban design for the area, in accordance with commonly accepted community planning and design practices, and the City's Master Plan.

Ch. 1140.01.  The City permits residents to display a "single for-sale, sold, for-rent, leasing, open house, religious, holiday or personal sign" in a window or on a lawn.  Ch. 1140.361.  Such signs must be removed within forty-eight hours "of a contract for sale, a lease agreement, the end of the holiday, or after otherwise fulfilling [their] purpose."  *Ibid.*  "Political signs," however, are not subject to the express single-sign limitation.  *See* ch. 1140.362.  All lawn signs, political or otherwise, are subject to the same size restriction: they may not exceed 6 square feet in area and must be 4 feet or less in height.  Ch. 1140.361, .362.

Additionally, the City imposes a maximum sign-face area for a single lot that is proportional to the lot's frontage: 1.35 square feet of sign area per foot of frontage.  *See* ch. 1140.27(a).  For example, if a lot has a 100-foot-frontage, it has a maximum sign-face area of 135 square feet.  But because of the maximum sign-face-area restriction, it could not display a single 135-square-foot sign.  It could, however, display twenty-two signs that were each 3-feet high and 2-feet wide; this would constitute a total sign-face area of 132 square feet.  If a lot fronts two or more streets, "each street frontage shall be calculated separately, and such individual totals shall apply separately and only to signs directed at those individual streets."  *Ibid.*

What this scheme means, practically, is that the City permits more political signs than non-political signs in residential districts. Suppose a homeowner has a corner 100-foot-square lot. Her 200-foot-frontage would afford her a maximum sign-face area of 270 square feet. The homeowner could display only one personal or religious sign but could display *forty-five* political signs measuring 6 square feet. In this respect, at least, the ordinance scheme favors political speech over non-political speech.

A person in violation of any sign ordinance may face a fine of up to $1,000 per each day that the sign violation occurs. Ch. 1140.99. Failure to remove a political sign within seventy-two hours after an election constitutes a "minor misdemeanor." *Ibid.*

B

In September 2011, Wagner placed a political sign on his lawn that measured 4 feet by 4 feet, i.e., 16 square feet. The sign criticized City Councilmember Tracy Mahoney for her position on both the use of traffic cameras and the imposition of a trash tax. Specifically, the sign said: "*You do the math* Traffic Camera's [sic] + Rubbish Tax = Mahoney Baloney." At the far bottom, the sign said in small text: "Paid for by: Frank Wagner, private citizen, 13409 Oakpark Blvd., Garfield Hts., OH 44125." A picture of the sign appears below:

3

Councilwoman Mahoney called Mayor Vic Collova to complain about Wagner's sign.[1] On September 10—a Saturday—Mayor Collova personally drove by Wagner's house to view the sign, which the mayor felt was "obviously larger" than the maximum 6-square-foot limit. That same Saturday, Councilwoman Mahoney also contacted William Wervey, the city's building commissioner, to complain about the sign; she left Wervey a photograph[2] and phone message requesting that Wervey inspect Wagner's sign. On Monday, September 12, Commissioner Wervey drove by Wagner's house, and the sign was not displayed. He informed the mayor of such. On September 17—again, a Saturday—Mayor Collova received another complaint from Councilwoman Mahoney who informed the mayor that the sign was again displayed on Wagner's property. Councilwoman Mahoney specifically requested that the City enforce the maximum sign-area limitation against Wagner. That Monday, Mayor Collova instructed the building commissioner to send a letter to Wagner to address the matter.

Wagner received a letter from the City, informing him that his sign was too large and asking him to remove the sign or reduce the size to conform. The letter, dated September 19, informed Wagner that a building inspector recently "had occasion to visit your property." The letter requested that Wagner give the sign violation his "prompt attention." It instructed that the violation "must be corrected" by September 23—four days from the date of the letter. The City maintains that it "did not threaten Mr. Wagner with prosecution in the Garfield Heights Municipal Court if the political sign was not removed by September 23, 2011." The City's letter, however, states: if the violation is not corrected "by September 23, 2011," "we have no choice but to proceed with legal action in the Garfield Heights Municipal Court."

---

[1] Another resident also complained to the City.
[2] It is unclear whether Mahoney left Wervey a physical photograph or sent one by e-mail or text.

Wagner removed the sign. He then sued the City, seeking a declaratory judgment that ch. 1140.362, the political-sign ordinance, was unconstitutional under the Federal and Ohio Constitutions. He sought to enjoin enforcement of the ordinance. Additionally, he moved for a temporary restraining order and preliminary injunction against the City. The district court granted Wagner's motion as to him but denied it as to others, and it ordered the City to allow Wagner to display his 16-square-foot sign until November 7, 2011.[3] The City counterclaimed, seeking a declaratory judgment that the ordinances regulating political signs were constitutional. The parties both moved for summary judgment.

The district court found that ch. 1140.352 imposed a content-based restriction on speech. Applying strict scrutiny, the district court found that the City's proferred interests in traffic safety and aesthetics were not compelling and that the ordinance, therefore, failed strict scrutiny. It also determined that the ordinance was not narrowly tailored. The court held the ordinance unconstitutional under the First Amendment, granted summary judgment for Wagner, and denied summary judgment for the City.

II

We review de novo a district court's grant of a plaintiff's motion for summary judgment and a denial of the defendant's cross-motion for summary judgment. *Ne. Ohio Coal. for the Homeless v. City of Cleveland*, 105 F.3d 110, 1109 (6th Cir. 1997). A district court's denial of summary judgment is generally a non-appealable interlocutory order, but we may properly review the denial "when the appeal from a denial of summary judgment is presented together with an appeal from a grant." *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004).

---

[3] Presumably, this was the day before election day.

III

A. First Amendment Framework

"Congress shall make no law . . . abridging the freedom of speech." U.S. const. amend. I. Neither may the states, *Gitlow v. New York*, 268 U.S. 652, 666 (1925), nor their political subdivisions, *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938). But the freedom of speech is not absolute. *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 (1961) (Harlan, J.). Relevant here is the doctrine permitting "general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise." *Id.* at 50. The First Amendment tolerates such restrictions on unfettered speech "when they have been found justified by subordinating valid governmental interests." *Id.* at 51.

The applicable substantive rules depend greatly on where the regulated speech occurs. Justice Frankfurter has asked, "Where does the speaking which is regulated take place? Not only the general classifications—streets, parks, private buildings—are relevant. [Also relevant are] [t]the location and size of a park . . . ." *Niemotko v. Maryland*, 340 U.S. 268, 282–83 (1951). Traditionally, the Court distinguishes among speech occurring in a public forum, a limited public forum, or a non-public forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983).

This case, however, is different in that it involves a citizen's attempt to speak on his own private property. "With rare exceptions, content discrimination in regulations of the speech of private citizens on private property . . . is presumptively impermissible, and this presumption is a very strong one." *City of Ladue v. Gileo*, 512 U.S. 43, 59 (1994) (O'Connor, J., concurring). The Court has said that the First Amendment operates with "special resonance when the

government seeks to constrain a person's ability to *speak*" in the home. *Id.* at 58 (majority opinion).

There is no doubt that, as a general matter, "signs are a form of expression" involving speech protected by the First Amendment. *Id.* at 48. This case concerns the extent to which a municipality may exercise its police powers to "regulate the physical characteristics of signs." *Ibid.*

Given the Court's special solicitude for speech in the home, we apply the same analytical structure that the Court applies to traditional public fora. Under this framework, the government may impose a content-based regulation on speech if it can show the regulation is necessary to serve a compelling state interest and if the restriction is narrowly tailored to achieve that end. *Perry*, 460 U.S. at 35. Content-neutral regulations, however, that restrict speech's time, place, or manner are permissible if the regulation promotes a significant interest unrelated to the suppression of a message and if the regulation allows for ample alternative channels of communication. *United States v. Grace*, 461 U.S. 171, 177 (1983).

The Court differentiates between content-based and content-neutral restrictions on speech. *See, e.g.*, *Forsyth Cnty. v. Nat'list Movement*, 505 U.S. 123, 134–35 (1992). Indeed, "[t]he normal inquiry that [Court] doctrine dictates is, first, to determine whether a regulation is content based or content neutral, and then, based on the answer to that question, to apply the proper level of scrutiny." *City of Ladue*, 512 U.S. at 59 (O'Connor, J., concurring).

In short, a content-based regulation triggers a strict-scrutiny test, whereas a content-neutral regulation triggers intermediate scrutiny. Although we are skeptical of ascribing too much significance to the difference between an "important" or "significant" interest and a "compelling" interest, that is the law. Justice Blackmun was never "able fully to appreciate what

7

a 'compelling state interest' is." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 188 (1979) (Blackmun, J., concurring). He felt that if "compelling interest" meant "'incapable of being overcome' upon any balancing process, then, of course, the test merely announces an inevitable result, and the test is no test at all." *Ibid.* Nonetheless, we adhere to the Court's traditional framework and determine whether the City's ordinance is content-based or content-neutral.

## B. Content-based or Content-neutral?

The implications of this threshold inquiry are clear enough: the decision determines the applicable standard. Less clear, though, is *how* to determine whether a regulation is content-based or content-neutral. "Deciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

One key inquiry "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A content-neutral regulation "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." *Ibid.* Whether a regulation has a content-based or content-neutral *purpose* is an important—but not dispositive— inquiry. *Turner*, 512 U.S. at 642–43. A second, important inquiry is whether a challenged regulation "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed" or whether it "confer[s] benefits or imposes burdens on speech without reference to the ideas or views expressed." *Ibid.*

The district court, after a thorough analysis, concluded that ch. 1140.362 is a content-based regulation because it treats political signs differently than non-political signs. The district court notes that the City's political-sign ordinance applies to all zoning districts, residential or not. *Cf.* ch. 1140.362 ("Political signs, [sic] may be placed . . . in any zoning district . . . ."). Consequently, the district court reasons, a non-political sign in a non-residential district may exceed six square feet, whereas a political sign in a non-residential district is subject to ch. 1140.362's size limitation. Additionally, the district court argues that the ordinance makes a content-based distinction in that it requires residents to remove political signs after an election concludes. *Cf. id.* (Political signs "shall be removed after the political issue or campaign is completed or no longer contested."). Essentially, the district court found that the ordinance is content-based because the City must determine whether a sign is political in nature before it can determine which provision of the city code applies; that is, the City must determine whether a sign is political or not.

The City contends that the district court erred by applying what the Fourth Circuit has called an "absolutist" test in determining that the ordinance is content-based. *See* Appellants Br. 21 (citing *Brown v. Town of Cary*, 706 F.3d 294, 302 (4th Cir. 2013)). In *Brown*—a case involving a substantively similar ordinance—the Fourth Circuit upheld a municipal ordinance that permitted two residential signs per property that did not exceed five square feet in area and three-and-a-half feet in height but that exempted "holiday decorations" and "public art." *See Brown*, 706 F.3d at 298. The court differentiated between content-based discrimination and mere content distinctions. *See id.* at 301–02. The court "eschew[ed] a formalistic approach to evaluating content neutrality that looks only to the terms of a regulation and instead embrac[ed] a

more practical inquiry." *Id.* at 301 (internal alterations omitted). According to the *Brown* court, "the notion that any content distinction is intrinsically content based misapprehends the proper analysis." *Ibid.* The court identified a circuit split between an "absolutist" and "practical" test for assessing content neutrality.[4] *See id.* at 302 (collecting cases). It sided with the latter approach, citing a decision of this circuit. *See ibid.*

That decision is *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009)[5], where we reviewed a municipal sign ordinance that required a permit to erect business signs. In that case, various city ordinances distinguished among various kinds of signs and contained separate definitions for "advertising signs," "business signs," and "political signs." *Id.* at 622. The ordinance scheme also imposed different height requirements on business and identification signs than it did on real estate, construction, and political signs. We did not view

---

[4] *Brown* identified three circuits that have adopted the "absolutist" approach: *Neighborhood Enters., Inc. v. City of St. Louis*, 644 F.3d 728, 736 (8th Cir. 2011) (holding sign-ordinance exemptions content-based because "one must look at the *content* of the object"); *Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) ("A regulatory scheme that requires the government to examine the content of the message that is conveyed is content-based regardless of its motivating purpose." (internal quotation marks omitted)); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1263–66 (11th Cir. 2005) (applying the absolutist approach).

The Fourth Circuit identified four circuits that have adopted "a more practical test for assessing content neutrality," *Brown*, 706 F.3d at 302, and it expressly followed that approach. *See Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 603 (7th Cir. 2012) ("A law is not considered 'content based' simply because a court must look at the content of an oral or written statement in order to determine whether a rule of law applies. (internal quotation marks omitted)); *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 389 (3d Cir. 2010) ("[A] consideration of the sign's content . . . does not by itself constitute a lack of neutrality as to specific content."); *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 622 (6th Cir. 2009) ("There is simply nothing in the record to indicate that the distinctions between the various types of signs reflect a meaningful preference for one type of speech over another."); *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1079 (9th Cir. 2006) ("[The regulation] does not require Lake Oswego officials to evaluate the substantive message . . . [and] certainly does not favor speech based on the idea expressed." (internal quotation marks omitted)).

[5] The court denied rehearing en banc with no active judge of the court requesting a vote on the petition. Order, *H.D.V.-Greektown, LLC v. City of Detroit*, Nos. 08-1329/1361 (6th Cir. Aug. 17, 2009), ECF No. 61.

this as a content-based regulation, writing that "[t]here is simply nothing in the record to indicate that the distinction between the various types of signs reflect a meaningful preference for one type of speech over another." *Ibid.* We declined to apply the absolutist approach, which we viewed as "an overly narrow conception of the definition of content-neutral speech." *Ibid.*[6]

A circuit split exists, and our circuit, in a published opinion, has taken a side. Whether a municipality must examine the content of a sign to determine which ordinance to apply "should merely be seen as indicative, not determinative, of whether a government has regulated for reasons related to content." *Brown*, 706 F.3d at 302. Just as context matters when applying strict scrutiny, so too does context matter when a court assesses content neutrality. Under the *Brown* approach, a regulation is content neutral if it is "justified without reference to the content of regulated speech . . . even if it facially differentiates between types of speech." *Brown*, 706 F.3d at 303 (internal quotation marks and citation omitted). In other words, there are content-based distinctions and "content-based distinctions," and in the "practical" circuits, "content based" is a term of art that refers to a distinction based on content because of an impermissible purpose. The Fourth Circuit has said that the issue is not "whether the Sign Ordinance has distinguished content [but is] whether it has distinguished *because* of content." *Brown*, 706 F.3d at 304. We agree.

2

This approach makes sense in the context of this case. First, the district court reasons that the City's code is content-based because political signs on non-residential property are subject to ch. 1140.362's size limitation, whereas non-political signs in non-residential districts do not have that limitation. This is true—but the basis for the difference in treatment is not whether a sign is

_____

[6] *H.D.V.-Greektown* did not specifically implicate the constitutionality of the ordinances as they related to political signs.

11

political or non-political but whether it is in or outside of a residential district. This case does not involve signs in non-residential districts.

At oral argument, Wagner—perhaps recognizing the weakness in his own position—spent considerable time recasting the discussion to one about political signs in commercial districts. But this case does not involve plaintiffs seeking to display oversized signs in non-residential districts. In his complaint, Wagner sought a declaratory judgment that the political-sign ordinance is facially unconstitutional—and to the extent that provision is non-severable, that the entire ordinance scheme is unconstitutional. Similarly, in its counterclaim, the City sought a declaratory judgment that ch. 1140.362—and to the extent it is non-severable, the entire sign-ordinance chapter—is constitutional. The district court's order enjoined the City from enforcing only ch. 1140.362, and the City appeals that order. Wagner cannot—either on appeal or in the first instance before the district court—successfully challenge the City's sign ordinances at large.[7] We reserve the question of whether an ordinance scheme that allows a giant Macy's sign

---

[7] It is true that in the First Amendment context, "the overbreadth doctrine allows a party to whom the law may constitutionally be applied to challenge the statute on the ground that it violates the First Amendment rights of others." *United States v. Stevens*, 559 U.S. 460, 483–84 (2010). In most constitutional cases, "that exceptional remedy requires the claimant to show one of two things: (1) that there truly are no or at least few circumstances in which the Act would be valid; or (2) that a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications." *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010) (internal citations and quotation marks omitted). Courts "rightly lighten this load in the context of free-speech challenges to the facial validity of a law." *Ibid.* In view of the risk that "enforcement of an overbroad law may deter people from engaging in constitutionally protected speech and may inhibit the free exchange of ideas, the overbreadth doctrine permits courts to invalidate a law on its face if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ibid.* (internal quotation and alteration marks omitted). But "[i]f the law does not reach a substantial amount of constitutionally protected conduct, then the overbreadth challenge must fail." *Speet v. Schuette*, 726 F.3d 867, 873 (6th Cir. 2013) (internal quotation marks omitted). "A plaintiff must demonstrate from the text of the statute and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally." *Id.* at 878 (internal quotation marks omitted).

in a non-residential district, but not an equally sized political sign, would offend the First Amendment.

The second reason the district court gives for finding that the sign ordinances are content based is that ch. 1140.362 limits the length of time that residents may display political signs. A resident must remove a political sign "after the political issue or campaign is completed or no longer contested." Ch. 1140.362. If a sign is non-political, it "must be removed within forty-eight (48) hours of a contract for sale, a lease agreement, the end of the holiday, or after otherwise fulfilling its purpose." Ch. 1140.361. This is a distinction without a difference: both political and non-political signs must be removed after fulfilling their purpose. If anything, non-political signs are subject to a restriction that political signs are not: non-political signs receive a 48-hour removal window. Political signs, in contrast, must be removed "within seventy-two hours after [an] election." Ch. 1140.99.

The district court also suggests that the City's sign-ordinance scheme is problematic because it subjects political signs to different restrictions than non-political signs. This is not true. Non-political signs in residential districts are subject to all the same restrictions that political signs face. But the converse is not true; that is, political signs are *not* subject to all the same restrictions of non-political signs. Non-political signs are subject to a single-sign limitation, whereas political signs are not. The failure to regulate political signs as heavily as non-political signs does not constitute content-based regulation. Wagner maintains that the City "singles political speech out for harsher and more restrictive regulation than non-political

Here, the record does not contain information about whether or how the political sign ordinance affects non-residential districts. Therefore, Wagner's challenge must fail. *See Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012) (holding statute was not substantially overbroad where "the record is utterly barren about whether some, many, indeed any [others] are affected by this proposed application of the statute"); *Connection Distributing Co. v. Holder*, 557 F.3d 321, 338–39 (6th Cir. 2009).

13

speech." Appellee Br. 21. But the exact opposite is true: it is non-political speech that is subject to more restrictive regulation. Because political signs are subject to no greater restrictions than are non-political signs, we do not find that ch. 1140.362 imposes a content-based regulation. Accordingly, we apply intermediate scrutiny.

## C. Intermediate Scrutiny

A challenged regulation passes intermediate scrutiny as a reasonable time, place, or manner restriction if it is "narrowly tailored to serve a significant government interest" and if it "leave[s] open alternative channels of communication." *Grace*, 461 U.S. at 177.

1

We decide whether the City's ordinance passes this scrutiny against a backdrop of several Supreme Court cases addressing the constitutionality of municipal sign ordinances.

In 1977, the Court addressed the constitutionality of a municipal ordinance that prohibited "for sale" signs on residential lawns, enacted by a town to stem white flight from the municipality. *See Linmark Assocs., Inc. v. Twp. of Willingboro*, 431 U.S. 85, 86 (1977). A unanimous Court held that the ordinance was not a content-neutral time, place, or manner restriction for two reasons: it did not leave open alternative channels of communication because "for sale" signs play a central role in marketing realty; and it prohibited "particular types of signs based on their content," as it feared the signs would fuel white flight. *Id.* at 93–94. In so holding, the Court strongly suggested that an ordinance merely regulating the manner of signage would be permissible. It noted that a law "requiring [lawn] signs to appear in [a particular] form . . . would raise very different constitutional questions." *Id.* at 98 (internal quotation marks omitted). "Willingboro['s] ordinance is not genuinely concerned with . . . the manner of the speech signs. The township has not prohibited all lawn signs or all lawn signs of a particular size

14

or shape in order to promote aesthetic values . . . ." *Id.* at 93. This case, however, involves exactly that situation—a municipality proscribing all lawn signs of a certain size to promote aesthetics.

Four years later, the Court considered a San Diego ordinance that effectively banned almost all outdoor advertising displays in the city. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 493–97 (1981). The case concerned "the law of billboards," *Metromedia*, 453 U.S. at 490. The Court first held that a large exemption that allowed billboards to advertise onsite businesses and activities did not render the ordinance constitutionally infirm. *See id.* at 511–12. The Court nonetheless struck down the ordinance. The plurality opinion reasoned that the problem was not San Diego's differentiation between advertising onsite and offsite services; rather, the problem was that the city allowed billboards to be used for certain commercial speech but not for non-commercial speech.[8] "The use of onsite billboards to carry commercial messages related to the commercial use of the premises is freely permitted, but the use of otherwise identical billboards to carry noncommercial messages is generally prohibited." *Id.* at 513.

In 1984, the Court upheld a Los Angeles ordinance that prohibited the posting of signs on public property. *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 791 (1984). In *Taxpayers*, a candidate for public office sought to attach cardboard political signs

---

[8] The case divided the Court and produced a number of opinions. Justice White delivered a plurality opinion. Justice Stevens dissented but joined Part IV of Justice White's opinion, which approved of the City's distinguishing between advertising onsite and offsite goods and services. Justices Brennan and Blackmun found the ordinance unconstitutional not because of its distinction between commercial and noncommercial speech but because its practical effect was "to eliminate the billboard as an effective medium of communication." *Metromedia*, 453 U.S. at 525 (Brennan, J., concurring in the judgment). Thus, they analyzed the ordinance under the Court's content-neutrality test, and they concluded that the ordinance did not survive intermediate scrutiny because the City's proffered interests were inadequate to justify a "total ban of a medium of communication." *Id.* at 526–30. Chief Justice Burger and Justices Stevens Rehnquist each dissented on different grounds.

15

to utility poles around Los Angeles. *Id.* at 792–93. The Court held the ordinance to be a content-neutral regulation because there was "not even a hint of censorship or bias in the City's enactment or enforcement of this ordinance." *Id.* at 804. The Court deemed it "well settled that the state may legitimately exercise its police powers to advance esthetic values," *id.* at 805, and Los Angeles's interest in promoting aesthetics and in combating the "visual assault" on residents was significant enough to withstand scrutiny, *id.* at 807. The Court also determined that the ordinance was sufficiently tailored because it "respond[ed] precisely to the substantive problem which legitimately concerns the City," *id.* at 810; that the ordinance left open ample alternative means of communication, *id.* at 812; and that the ordinance was not overbroad, *id.* at 815–17.

In 1994, the Court again addressed a residential sign ordinance—one that prohibited residents from displaying any signs on their property except "for sale" signs, "residence identification" signs, and signs warning of safety hazards. *City of Ladue v. Gilleo*, 512 U.S. 43, 45 (1994). A municipal resident wished to display an 8.5 by 11-inch sign in a second-story window that said "For Peace in the Gulf." *Id*. at 46. The Court assumed the ordinance to be a content-neutral regulation, *id.* at 53, but invalidated the ordinance because the ban on almost all residential signs "completely foreclosed a venerable means of communication that is both unique and important." *Id.* at 54. The challenged ordinance did not leave open ample alternative means of communication because "[d]isplaying a sign from one's residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text by picture or other means." *Id.* at 56. The Ladue ordinance confronted the Court with a near total ban on residential signs—not "regulations short of a ban." *Id.* at 58 n.17.

2

With this context in mind, we conclude that the City's interests are significant ones.[9] The

City enacted its sign ordinances to promote its interests in traffic safety and aesthetics. *See* ch.

1140.01. As noted, a state "may legitimately exercise its police powers to advance esthetic

values." *Taxpayers for Vincent*, 466 U.S. at 805. "It is far too late to contend" that traffic safety

and aesthetics are not "substantial governmental goals." *Metromedia*, 453 U.S. at 507–08.[10]

This court has also deemed aesthetics and traffic safety to be important governmental interests.

*See Prime Media, Inc. v. City of Franklin*, 181 F. App'x 536, 539 (6th Cir. 2006); *Prime Media,

Inc. v. City of Brentwood*, 398 F.3d 814, 819 (6th Cir. 2005).

Chapter 1140.362 also satisfies intermediate scrutiny's narrow-tailoring requirement

because the ordinance is a modest infringement on residents' rights to use their lawns for speech.

Intermediate scrutiny's tailoring requirement differs importantly from the more rigorous tailoring

mandated by strict scrutiny. To survive intermediate scrutiny, a regulation must be narrowly

tailored, but it need not be the least restrictive means of furthering the government's important

interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). All that is necessary to

satisfy narrow tailoring is that the "regulation promotes a substantial government interest that

would be achieved less effectively absent the regulation." *Id.* at 799. Here, the City's interests

in aesthetics and traffic safety are achieved more effectively by the presence—than by the

absence—of ch. 1140.362. Consequently, the ordinance satisfies the tailoring condition.

Wagner highlights the fact that the City's sign-ordinance scheme allows him to post

dozens of smaller signs across his property—but does not allow him to post a single 16-square-

---

[9] Courts refer to the kinds of interests that intermediate scrutiny sanctions as "important," "significant," "substantial," and "legitimate." We are careful, however, to avoid using the word "compelling"—the term of art that signals strict scrutiny is involved.

[10] Five Justices—the four plurality Justices and also Justice Stevens—joined this part of the opinion.

foot sign. This, Wagner argues, proves the lack of narrow tailoring. *See* Appellee Br. 38–42. The sign ordinances permit 1.35 square feet of sign area per foot of lot frontage. *See* ch. 1140.27(a). Because Wagner's lot has a frontage of 35 feet on Oak Park Boulevard and 100 feet on East 135st Street, he may display a total of 147.24 square feet of signage. That means he could potentially display twenty-four political signs on his lawn even if each sign measured the maximum lawful 6-square-feet in area—and even more signs, if smaller. Thus, the sign-ordinance scheme permits a great deal of political speech, without what some would consider the type of visual blight from very large signs in residential areas.

Wagner's point here is factually accurate, but a regulation need not represent everyone's view of rationality to satisfy the tailoring condition. The City's sign ordinances are perhaps not the exact ones we would write were we policymakers—but that is not the test. "The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Ward*, 491 U.S. at 800 (internal quotation marks and alterations omitted). "Plausible policy arguments might well be made in support of [a different ordinance], but it by no means follows that it is constitutionally mandated." *Taxpayers for Vincent*, 466 U.S. at 816. A regulation is not invalid "simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. Intermediate scrutiny's tailoring requirement does not demand perfect tailoring. Here, it is satisfied.

Lastly, we find that ch. 1140.362 leaves open ample alternative channels of communication. This is the requirement that doomed the sign ordinance in *City of Ladue*. *See* 512 U.S. at 57–58. In *Ladue*, the city's nearly total ban on residential signs left residents with no

18

adequate substitute.  In the Court's view, "[r]esidential signs are an unusually cheap and convenient form of communication." *Id.* at 57.  For the poor and affluent alike, "the added costs in money or time of taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a handheld sign make the difference between participating and not participating in some public debate." *Id.* at 57.  The present case, though, unlike *Ladue*, is not one where the City is banning an entire form of expression.

Wagner retains numerous alternative ways to communicate his message.  Not only may he hand out leaflets or take out newspaper advertisements, but he may blanket his lawn in signs that declare "Mahoney Baloney."  The one thing he may not do is post a sign that exceeds 6 square feet in area and 4 feet in height.  *See City of Franklin*, 181 F. App'x at 541 (finding a sign-size ordinance to leave open "other lawful means of expression" because the city allowed smaller signs); *City of Brentwood*, 398 F.3d at 819 (finding a billboard-size ordinance to leave open ample alternative channels of communication because the city allowed billboards that satisfied the size restrictions).

The City's political-sign ordinance survives intermediate scrutiny because it serves significant government interests, is narrowly tailored to promote those interests, and leaves open alternative channels of communication.  The Supreme Court has said "[i]t is common ground that governments can regulate the physical characteristics of signs."  *City of Ladue*, 512 U.S. at 48.  That is exactly what Garfield Heights has done here.

IV

That ch. 1140.362 is facially constitutional does not mean that the City acted in good faith in enforcing the ordinance against Wagner.  Commissioner Wervey maintains that the content of Wagner's sign did not influence his decision to inform Wagner of the ordinance

19

violation. Wervey's *personal* decision may not have been motivated by the sign's content. Rather, his decision to contact Wagner was motivated by the mayor's personal request. And the mayor's request, in turn, was motivated by a complaint from Councilwoman Mahoney. And it seems safe to assume that Councilwoman Mahoney, in deciding to complain to the mayor, was offended by the sign's content—not its noncompliance with the maximum sign-face restriction of City of Garfield Heights Codified Ordinance 1140.362.

After Councilwoman Mahoney complained about Wagner's sign directly to the City's mayor and building commissioner, the City issued Wagner a letter, giving him less than one week to correct his ordinance violation. Otherwise, the City threatened it would prosecute Wagner in municipal court.

Under these circumstances, the district court enjoined the City from enforcing the sign ordinances against Wagner until the November 2011 election. The facts here, however, prohibit a finding that the City's sign-ordinance scheme is unconstitutional as it relates to residential districts, and this appeal does not present the question whether the City's enforcement of the ordinance violated Wagner's constitutional rights.

V

For these reasons, we hold the ordinance is constitutional as it relates to residential signs. Today's decision joins others from our circuit that have upheld municipal ordinances prescribing the size and height of signs. *See City of Franklin*, 181 F. App'x at 540–41 (ordinance limiting free-standing signs to 32 square feet); *City of Brentwood*, 398 F.3d at 814 (ordinance limiting billboards to 120 square feet in area and 6 feet in height).

We REVERSE the judgment of the district court, REMAND the case, and direct the district court to enter judgment for defendants on this issue.