In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1739

CONSTRUCTION AND GENERAL LABORERS' UNION NO. 330, *et al.*,

*Plaintiffs-Appellants*,

*v.*

TOWN OF GRAND CHUTE,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 14-C-455 — **William C. Griesbach**, *Chief Judge*.

ARGUED SEPTEMBER 24, 2018 — DECIDED FEBRUARY 14, 2019

Before WOOD, *Chief Judge*, and EASTERBROOK and
BRENNAN, *Circuit Judges*.

WOOD, *Chief Judge*. Scabby the Rat has returned. Insofar as
this case is concerned, he first made his appearance in the
Town of Grand Chute, Wisconsin, in connection with a labor
dispute there. When the Union could not persuade the district
court to enjoin a Town ordinance forbidding Scabby's pres-
ence, it appealed to this court. We were concerned, however,
that the case might be moot, because the construction project

Scabby had adorned was long since completed. *Construction and General Laborers' Local Union No. 330 v. Town of Grand Chute, Wisconsin*, 834 F.3d 745 (7th Cir. 2016) (*Scabby I*). We therefore returned the case to the district court for further exploration of the original controversy and the significance, if any, of a replacement ordinance the Town enacted in 2015.

The district court did as we asked. *Construction and General Laborers' Local Union No. 330 v. Town of Grand Chute*, 297 F. Supp. 3d 850 (E.D. Wis. 2018) (*Scabby II*). It concluded that the case was not moot, because the Union was seeking damages stemming from the 2014 events. On the merits, the court held that the Town did not discriminate against the Union in violation of the First Amendment when it banned Scabby under its 2014 Sign Ordinance, and that the 2015 Sign Ordinance also passed constitutional muster. The Union has appealed from those rulings. We conclude that the district court correctly concluded that the dispute over the 2014 Ordinance was not moot, and that the Ordinance did not discriminate on the basis of content in violation of the First Amendment. Whatever dispute may exist over the 2015 Ordinance is not ripe at this time, however, and so we dismiss that part of the case without prejudice.

**I**

Scabby the Rat is a familiar sight in certain parts of the country when a dispute breaks out between a union and an employer. He is notable both for his symbolic meaning and for his size—he is a giant, inflatable balloon, available in sizes from 6 to 25 feet tall. See *Union Rats—Rat Pack—Union Balloons*, BIG SKY BALLOONS, http://www.bigskyballoons.com/ratpack.html (last visited Feb. 13, 2019). Scabby made his appearance in this case after Local 330 of the

Construction and General Laborers' Union learned that a masonry company working at Kolosso Toyota, in the Town of Grand Chute, was not paying area standard wages and benefits. The Union decided to engage in informational picketing at the site and to set up Scabby in the median directly across from the dealer, along the frontage road for West College Avenue, a major local thoroughfare. (The Union also used a large inflatable "Fat Cat," but there is nothing unusual about the Cat that requires discussion.)

The Union protest began on Monday, March 31, 2014. Union members installed a 12-foot version of Scabby by tethering the huge inflatable rat to stakes that had been pounded into the ground; whenever Union members were not there to attend him, they deflated him (a 54-second procedure). The protest went smoothly on the first day, but trouble began to brew on April 1. Eric Thiel, the Code Enforcement Officer for the Town, went to the protest site and told the Local's president, Kelly Buss, that the Union would have to deflate Scabby because the rat violated § 535-108 of the Town's Sign Ordinance. Buss was surprised, because he had discussed the Union's protest plans with the Grand Chute Police a few days before and they had voiced no objection.

When all was said and done, the Union lost this round. See generally *Scabby II*, 297 F. Supp. 3d at 859–62. It was forced to remove Scabby from the scene and resort to other methods of protest. That was when the Union filed this action in the district court; it asserted that the Town's 2014 Ordinance violated the First Amendment because it distinguished among signs on the basis of content. The district court denied its motion for a preliminary injunction and later entered summary judgment for the Town.

The Union appealed the summary judgment ruling to this court. We concluded that we needed more information before we could reach the merits of the case, because we were concerned that the completion of the construction project that prompted the protest may have mooted the controversy. *Scabby I*, 834 F.3d at 748. Neither of the two possible theories that would avoid mootness—a live dispute over damages, or a claim capable of repetition yet evading review, see *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)—had been explored enough for us to proceed. Moreover, we noted, the Town amended its Code in 2015 and replaced the 2014 version of the Sign Ordinance with a new one. *Id.*

On remand, the district court first issued an order finding that the case was not moot. The Union assured the court, and the Town did not dispute, that the Union was seeking damages based on the fact that it had been forced to pay members to assist in the area-standards picketing at Kolosso and to draw greater resources from its organizing affiliate to staff and maintain the protest. The court noted, however, that the likelihood of recurrence theory was not available to the Union because of the amendment to the Ordinance. Order, *Construction and General Laborers' Local Union No. 330 v. Town of Grand Chute*, No. 14-CV-455 (E.D. Wis. Feb. 3, 2017), ECF No. 64.

The court then turned to the merits. In doing so, it assessed the Union's claims under both the 2014 Ordinance, which was in effect during the Kolosso picketing, and the 2015 Ordinance. The Union argues that both the past enforcement of the 2014 Ordinance and any potential future enforcement of the 2015 Ordinance against Scabby violates its First Amendment Rights. As the posture of the case differs significantly under the two Ordinances, we address them separately.

## II

The lion's share of the district court's opinion focused on the Union's claim for damages based on the 2014 Ordinance, and so we begin with that. We may uphold a law that restricts even protected speech in a public forum if the restriction is content neutral, narrowly tailored to serve a significant governmental interest, and leaves open ample alternative ways to communicate the desired message. See *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). As we acknowledged in our earlier opinion, there is no doubt that a union's use of Scabby to protest employer practices is a form of expression protected by the First Amendment. *Scabby I*, 834 F.3d at 751. Rats, as the manufacturer attests, "Get Attention." *Rats Brochure*, BIG SKY BALLOONS, http://www.bigskyballoons.com/pdfs/RATS_pg.pdf (last visited Feb. 13, 2019).



*Id.* We also noted, however, that a municipality is entitled to implement a nondiscriminatory ban of *all* private signs from the public roads and rights-of-way. *Scabby I*, 834 F.3d at 748 (citing *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984)). Grand Chute said that it had done no more than that. We agreed with the Town that its 2014 Ordinance was "comprehensive and content-neutral." *Id.* at 749. But that is not the end of the story. We pointed out that even a neutral ordinance can violate the First Amendment if it is enforced selectively, "permitting messages of which [the Town] approves while enforcing the ordinance against unions and other unpopular speakers." *Id.*

The Union argued that just such selective enforcement was going on in connection with the Kolosso protest. It offered two paths toward that conclusion. First, it contended that the 2014 Ordinance placed no meaningful limits on the Code Enforcement Officer's discretion, and so the Town's enforcement was necessarily selective. It relied for that proposition on *Smith v. Executive Director of Indiana War Memorials Commission*, 742 F.3d 282 (7th Cir. 2014), which holds that "[t]o qualify as content-neutral, a permit policy cannot invest 'unbridled discretion' in the person who decides whether a permit will issue because excessive discretion can lead to discriminatory enforcement." *Id.* at 289. It also argued that Officer Thiel was allowing certain signs that were incompatible with the Town's Ordinance to remain undisturbed, while at the same time he was insisting that Scabby had to go. The district court rejected both theories. *Scabby II*, 297 F. Supp. 3d at 857–58.

We take up the complaint about Officer Thiel first, because his actions influence both of the arguments the Union is

presenting. In short, the findings of fact that the district court made on remand do not indicate either actual favoritism on Thiel's part or so much discretion that discriminatory enforcement was inevitable.

Shortly after the Union's protest began, the Town's chairman notified Thiel that someone had complained about the rat. Thiel assumed that Kolosso was the complainant, but he did nothing to verify that fact. The evidence showed that Thiel had the primary responsibility for enforcing the Sign Ordinance, although the police department occasionally helped out on weekends or after hours. (A one-person enforcement staff might seem rather small, but it is worth bearing in mind that in 2014 Grand Chute had a population of 21,583, covering approximately 23 square miles. See GRAND CHUTE FIRE DEPARTMENT, 2014 ANNUAL REPORT 5, ht tp://www.grandchute.net/i/d/gcfd_2014_annual_report.pdf. The fact that Thiel worked alone is thus not too surprising.)

Thiel explained that his job as Code Enforcement Officer included ensuring compliance with the Town's zoning ordinances, of which the Sign Ordinance was one. Zoning in general accounted for about 25% of his workload. The district court described Thiel's testimony about the Sign Ordinance as follows:

> [Thiel] testified that he finds the majority of his sign ordinance violations while driving around the Town; however, he does occasionally investigate a complaint about a sign that he receives from either a citizen or a member of his staff. Thiel testified that when he receives a citizen complaint about a sign, the complainant normally does not indicate why he or she is complaining about a given sign and Thiel does not

ask. Furthermore, he testified that his standard practice to enforce the Town's sign ordinance after a complaint was to go to the site and investigate in person. If he deemed a sign in violation of an ordinance, he would either remove the sign immediately or talk to the property owner and inform the owner that he or she needs to remove the sign.

*Scabby II*, 297 F. Supp. 3d at 861.

Initially, there was some confusion about which Town official had the final word about Scabby's presence on West College Avenue. On April 1, Thiel told Local president Buss that the rat violated section 535-108 of the 2014 Ordinance and that it thus had to be deflated and removed. Buss then sought a second opinion from Police Officer Reifsteck, who told him to the contrary that Scabby could stay because the Ordinance addressed only *commercial* signs, and the Union was using him for a non-commercial purpose. Confusing matters further, Thiel admitted at trial that he had cited the wrong section of the Ordinance in support of his order to remove the rat. He should have pointed to section 535-106C, which covers the public right-of-way.

In any event, based on Reifsteck's advice, the Union used Scabby all day on April 2 without incident. On April 3, the Union's representatives were approached by a different code enforcement officer from neighboring Appleton, Wisconsin. The Appleton officer thought that Scabby had strayed over the line between Grand Chute and Appleton and that he violated Appleton's laws. The Union obeyed that order and moved Scabby over to the Grand Chute side of the boundary. Scabby remained inflated for the rest of the day on April 2. The Union did not use him on April 4, 5, and 6.

Thiel was aware of Scabby's re-inflation on April 2, but he took no action until he could clarify whether Scabby was a "sign" within the meaning of Grand Chute's ordinance, and whether the way the Union was using him amounted to a violation. During a meeting on April 3, Thiel and other town officials agreed that Scabby was indeed a "sign," and that the fact that he was tethered to the ground by means of the stakes meant that he was not permitted under the Ordinance. The Union tried inflating Scabby again on April 7, but Officer Reifsteck ordered immediate removal and made a comment about the publicity Scabby was attracting. The district court credited Reifsteck's testimony that the reason he instructed the Union to stop using the rat was because it violated section 535-106C, not because of the newspaper coverage.

The Union tried to show that the Grand Chute officials— especially Thiel—were discriminating against the message Scabby was conveying so effectively. Union officials photographed other signs within the Town that allegedly did not comply with the Ordinance. But Thiel testified that he had investigated every one of the signs identified by the Union and had taken action where he found a violation. Of the 60 alleged violations Union official Linsmeier presented, Thiel found only five on the public right-of-way. The remainder were either no longer present or were located on private property. Local president Buss photographed another 30 alleged violations, but Thiel reviewed all of them and found that only nine were on the public right-of-way. For those nine, he either removed them or instructed the owner to remove them.

The Union also complained that the Grand Chute Fire Department had been allowed to use a sign on the public

right-of-way in connection with its "Fill the Boot" campaign for the Muscular Dystrophy Association. But, as Thiel explained, the Fire Department's sign rested on a folding easel and so did not violate the ordinance, which covered only signs that were affixed to the ground.

Thiel frankly admitted that he may not have ferreted out every non-compliant sign on a public right-of-way in the Town. But he testified that he has never seen a violation and failed to enforce the Ordinance against it. He estimated that he had removed approximately 150 signs a year from 2013 to 2015, and that he has never given a sign owner more than 24 to 48 hours to remove a non-compliant sign.

As we noted earlier, in *Scabby II* the district court credited Thiel's testimony in all these respects. It accordingly found that the Town did not discriminate on the basis of content when it ordered Scabby and the Fat Cat removed. It also concluded that the fact that Thiel took the time to investigate the scope of the Ordinance was not proof of content-based action. Nor, it said, did Thiel's handling of the 90 cases represented in the Union's photographs show anything but even-handed enforcement on Thiel's part. The court found irrelevant the fact that Thiel had not always been consistent with respect to signs on *private* property. (Thiel did not regard holiday inflatables such as Santa Claus and Frosty the Snowman as "signs" covered by the Ordinance.) The part of the Ordinance relevant to the Union addressed only public property, and as far as this record shows, the Union had neither sought nor been denied a permit to place Scabby on private property.

Based on this evidence, the district court held that the 2014 Ordinance was content neutral and that the Town's rule was

narrowly tailored to meet its stated purpose—the banning of anything on the public right-of-way that might obstruct vision or distract passing drivers—noting that the Town did not have any obligation to find the least restrictive means possible. *Scabby II*, 297 F. Supp. 3d at 865 (citing *Ward*, 491 U.S. at 798). Finally, consistent with what this court had observed in *Scabby I*, the district court underscored that the Union had enough alternate means of communicating its message. *Id.* at 866.

The Union gives us no reason to doubt the district court's findings of fact, which we can disturb only if we find them to be clearly erroneous. FED. R. CIV. P. 52(a). Thiel's testimony also suffices to show that the Town's Ordinance was not so open-ended and vague as to leave Thiel with no guidance whatsoever. It defined the term "sign" well enough to distinguish between something on an easel and something held by posts in the ground. Thiel also testified that he understood there to be a difference between a holiday inflatable decoration and a sign. Whether he was correct on that point does not matter for present purposes. He was observing a testable line, not using unbridled discretion. Indeed, no evidence indicated that Thiel was anything but systematic in his enforcement of the 2014 Ordinance.

We therefore affirm the district court's judgment insofar as it rejects the Union's claims based on the 2014 Ordinance.

### III

As we noted earlier, the district court also issued a decision on the merits with respect to the 2015 Ordinance. The Union alleged that, had it not been for that law, it would have used Scabby again on a public right-of-way in several

additional instances unrelated to the Kolosso protest. But it refrained from doing so, it asserted, because the Town told it that the new Ordinance prohibited the use of inflatables in those settings.

There are some important differences between the 2014 §and the 2015 Ordinances. For example, the 2015 Ordinance does not impose a blanket prohibition against signs on the public right-of-way. Instead, it says that "No part of a sign may be located in public road right-of-way [*sic*] *unless allowed* by Town Board approval *because of unique circumstances or unusual hardship*." 2015 Ordinance, § 535-106D(5) (emphasis added). The 2015 Ordinance also has a section dedicated to inflatables, which reads as follows:

> Inflatable signs. Inflatable signs are permitted only on lots in the Community Center sign district. All inflatable signs must be placed a minimum of 10 feet from any property line, and must be directly anchored to the ground with a tether having a maximum length of 5 feet. Inflatable signs require a permit and may be in use for a maximum of 5 days in any consecutive 6-month period.

*Id.*, § 535-106F(5).

Nothing in this section limits its application to the public right-of-way, and so it squarely raises the question whether Pumpkin, Santa Claus, Frosty, or Spiderman inflatables that were permitted on private property under the 2014 Ordinance are now subject to the new blanket restrictions. Thiel's testimony at trial revealed that he was enforcing an unwritten holiday decoration exception to the 2015 Ordinance. He admitted to allowing inflatables he considered holiday decorations on

private property, and he suggested that Scabby might qualify for this exception if he donned a Santa hat. The litigation over Scabby, however, had prompted Thiel to re-evaluate this policy and consider whether he needed to adopt a more even-handed prohibition of all signs—festive or no. Indeed, if Santa is sending a message about celebrating the Christmas holiday, or Spiderman is some form of commercial speech touting a new movie release, the Town might have a hard time explaining why they are permissible and Scabby is not.

Interesting as those questions are, we conclude that they are for another day and that the district court should not have addressed the 2015 Ordinance at all. The Union's allegations about protests it *might* have conducted are too speculative to create a concrete dispute. See *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). Should such a dispute arise, it would provide necessary context: Would Scabby (or any other inflatable) be on private or public property? How (if at all) would the Code Enforcement Officer distinguish among different inflatables? What would the record show about the consistency of the Town's policies? The answers to these and similar questions are potentially important, but as the record now stands they elude us entirely. This part of the case should have been dismissed for failure to present a ripe Article III case or controversy.

\*\*\*

We therefore AFFIRM the district court's judgment with respect to the 2014 Ordinance, and we VACATE its judgment and REMAND for dismissal without prejudice of the Union's case with respect to the 2015 Ordinance. Each side is to bear its own costs on appeal.